# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI'I

HARALDS JASS,

       Plaintiff,

    vs.

CHERRYROAD TECHNOLOGIES, INC., *et al.*,

       Defendants.

Case No. 19-cv-00609-DKW-RT

**ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; AND (2) GRANTING PLAINTIFF LEAVE TO AMEND THE COMPLAINT**

      This is an employment dispute involving a high-ranking, corporate whistleblower. Plaintiff Haralds Jass alleges that shortly after he began complaining about several potentially illegal business practices by CherryRoad Technologies, Inc., he was terminated from his position as President of Superb Management Corporation, a company allegedly "controlled" by CherryRoad. But Jass has not sued Superb. Instead, he names as Defendants CherryRoad, its Chief Executive Officer (Jeremy Gulban), and its Chief Financial Officer (Nicholas Visco), asserting three claims: breach of contract; violation of the Hawaii Whistleblower Protection Act (HWPA), Haw. Rev. Stat. § 378-61 *et seq.*; and civil conspiracy. Defendants have now moved to dismiss all claims on several grounds, Dkt. No. 5, arguing primarily that Jass failed to exhaust his administrative remedies, that CherryRoad was not a party to Jass' employment contract or Jass' employer, and that Jass cannot

assert a freestanding civil conspiracy claim against Defendants Gulban and Visco.

The Court first concludes that Jass has not exhausted administrative remedies for his retaliation claim and may not avoid that obligation by attempting to recharacterize it. Second, Jass has stated a cognizable HWPA claim against CherryRoad under a "joint employer" theory, but has failed to sufficiently plead a breach of contract claim against CherryRoad under the applicable "alter ego" doctrine. Lastly, because Jass has not asserted an independent tort claim against Defendants Gulban and Visco, Jass cannot sustain a civil conspiracy claim against these Defendants. Accordingly, Defendants' motion to dismiss is GRANTED IN PART AND DENIED IN PART, and Jass is granted leave to amend the complaint.[1]

## FACTUAL & PROCEDURAL BACKGROUND

### A. Relevant Factual Allegations

Jass was previously the principal of Superb Internet Corporation until May 1, 2019 when Jass sold the company's assets to Defendant CherryRoad Technologies, Inc. (CherryRoad). At the same time, Jass became President of Superb Management Corporation (SMC), an entity allegedly "controlled by [CherryRoad]." Dkt. No. 4-4, ¶¶ 13–15.

---

[1]At the outset, Defendants ask the Court to strike the portion of Jass' brief in opposition that exceeds the 6,250-word limit provided by LR 7.4(a)–(b). Dkt. No. 11 at 9. Jass' Certificate of Compliance states that his opposition brief is 6,388 words in length. Because Jass has failed to comply with LR 7.4, the last 138 words of his opposition brief, Dkt. No. 10 at 28–29, beginning with the words "were motivated by selfish interests . . . ," are hereby STRICKEN.

### 1. Terms of the Employment Agreement

On May 1, 2019, Jass and SMC entered into an employment agreement (Agreement), Dkt. No. 5-2, with a three-year Term. Dkt. No. 4-4, ¶ 16.[2] The Agreement provides that for the first year, Jass would be paid a base salary of $15,000 per month and be eligible for a bonus. Dkt. No. 5-2, ¶ 4(a). During the second and third years of the Agreement, Jass would be paid a salary of $7,500 per month and would no longer be eligible to participate in any bonus plans. *Id.* at ¶ 4(b).

Under the Agreement, Jass' employment could "only be terminated by a majority vote of the [SMC] directors." *Id.* at ¶ 10. He could be terminated "without Cause at any time upon written notice." *Id.* at ¶ 10(a). If that occurred, Jass was entitled to (i) his base salary remaining for the Term of the Agreement, calculated using the salary rate in effect at the time of termination; plus (ii) the monthly payment SMC made toward medical insurance on Jass' behalf multiplied by the number of months remaining in the Term (collectively the "Separation Amount").

---

[2]Although materials outside the pleadings are generally not considered in ruling on a Rule 12(b)(6) motion, a court "may consider extrinsic evidence not attached to the complaint if the document's authenticity is not contested and the plaintiff's complaint necessarily relies on it." *Johnson v. Fed. Home Loan Mortg. Corp.*, 793 F.3d 1005, 1007 (9th Cir. 2015); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *see* Dkt. No. 4-4, ¶¶ 17–26, 73. That is the case with the Agreement. Moreover, the terms of a written instrument trump the allegations in the complaint. *Johnson*, 793 F.3d at 1007–08; *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008) ("[W]e need not accept as true allegations contradicting documents that are referenced in the complaint.").

*See id.* Jass could also be terminated with cause. *Id.* at ¶ 10(b). If that occurred, Jass was only entitled to receive his base salary earned through the effective date of termination. *Id.*

The Agreement defines "Cause" to include the following five categories of conduct:

> (A) "knowingly violating any law or regulation applicable to the business . . ., which violation is materially injurious to any Superb Group Party";
>
> (B) "conviction of, or plea of guilty or nolo contendere to, a felony";
>
> (C) "fraud, dishonesty or gross misconduct that is materially and demonstratively injurious to a Superb Group Party";
>
> (D) "any material breach . . . of any written agreement . . . regarding the terms of [Jass]'s service as an employee . . ., including the breach of the written non-competition, invention assignment, confidentiality or similar written restrictive covenants"; or
>
> (E) any "intentional and sustained disregard of a policy of [SMC], or the lawful directions or instructions of [SMC]'s directors."

*Id.* at ¶ 10(e)(i). The Agreement further states that:

> [F]or Cause to exist, [SMC] must give [Jass] written notice specifying in reasonable detail the act(s) or omission(s) that [SMC] believes constitute Cause and, in the case of [conduct within categories] (A), (D), and (E) . . ., a reasonable opportunity for [Jass] to correct such act(s) or omission(s).

*Id.*

## 2.    Alleged Whistleblower Conduct

When Jass assumed his position as President of SMC, Defendant Jeremy Gulban was the Chief Executive Officer of CherryRoad. Defendant Nicholas Visco

served as CherryRoad's Chief Financial Officer.  Dkt. No. 4-4, ¶¶ 4–5.

Beginning sometime in June 2019 through late July 2019, Jass alleges he engaged in protected activities as a whistleblower when he complained to Defendants about suspected or perceived violations of the law related to five topics: (1) discrimination against minority employees; (2) tax and accounting fraud; (3) consumer fraud; (4) interference with personal electronic communications; and (5) contracts between CherryRoad and the State of Hawaii.  *See id.* at ¶¶ 29, 32–33, 40–41, 47, 49, 67, 77.

First, prior to the end of June 2019, Jass believed that minority employees at CherryRoad were being discriminated against.  That prompted him to make several complaints to CherryRoad and, specifically, to Gulban.  *Id.* at ¶ 29.

Second, on June 24, 2019, Jass asserted a complaint regarding accounting and tax fraud perpetrated by Visco.  *Id.* at ¶ 47.  Jass questioned Visco's accounting methods—namely, that Visco intentionally underreported company revenues by excluding income from company billing systems and accounting programs.  *Id.* at ¶ 47.  Visco allegedly responded by threatening that he and Gulban would make Jass' life "miserable."  *Id.*  Visco further stated he would "misrepresent" Jass' work.  *Id.* at ¶ 47.

Third, in June 2019, Jass complained directly to CherryRoad and, specifically, to Gulban about CherryRoad's practice of charging customers unauthorized and

higher than advertised fees.  *See id.* at ¶¶ 32, 38.  Specifically, Jass asserts that he repeatedly raised serious concerns about CherryRoad moving certain shared hosting platform clients to a less expensive service and then overriding the price, such that the clients were charged a higher than advertised price—without notice or forewarning.  *Id.* at ¶ 32.  Jass complained that this business practice could amount to consumer fraud in violation of Hawaii law.  *Id.* at ¶ 33.  Gulban admonished Jass to never place such concerns in writing and to "only" broach such discussions "verbally," but Jass responded that he had a "strong overriding sense of responsibility" in raising these issues.  *Id.* at ¶ 33.

Within hours of expressing this concern, Defendants started "barraging" Jass with baseless accusations, personal attacks, insults, criticisms, and admonishments regarding his job.  *Id.* at ¶ 33.  Jass acknowledges, however, that Gulban also stated, "Let's discuss with the group and come up with a solution that is ethical and appropriate.  You will be a contributor to the discussions."  *Id.* at ¶ 35.  Nonetheless, that discussion allegedly never occurred.  *Id.* at ¶ 35.

Instead, on June 27, 2019, Gulban accused Jass of "building a file" against him and CherryRoad.  *Id.* at ¶ 27.  In turn, Gulban warned that he and Visco had started a "file" on Jass, which Jass understood as an admission that he was being retaliated against and that he would eventually be terminated by Gulban, Visco and CherryRoad.  *See id.* at ¶¶ 28, 34.  In fact, shortly after Jass began to voice his various

concerns, including those relating to consumer fraud, Jass alleges that Gulban and Visco began to make false claims about the quality of his work. *Id.* at ¶ 56.

To make matters worse, on July 1, 2019, Defendants allegedly: (a) blocked Jass from accessing internal customer and operational systems; and (b) removed Jass from numerous internal mailing lists, such as the internal sales management email group. *Id.* at ¶¶ 33, 35, 47, 58. As a result, it was difficult, if not impossible, for Jass to fulfill his obligations under the Agreement, including "presid[ing] over quality control" and "develop[ing] and maintain[ing] relationships with clients." *Id.* at ¶¶ 35, 58. The restrictions also meant that Jass could no longer observe Defendants' business practices or utilize the systems to voice additional concerns. *Id.* at ¶ 35. In addition, Jass was "demoted" without forewarning or explanation when his employee status was changed from exempt to non-exempt. Jass maintains, however, that he was never paid for overtime hours associated with his non-exempt status. *Id.* at ¶¶ 36–37. Notwithstanding this state of affairs, Jass alleges he was not dissuaded and continued to complain about CherryRoad's "bait and switch" practice toward clients. *Id.* at ¶ 38.

Fourth, Jass lodged complaints about Gulban and CherryRoad's repeated violations of the Electronic Communications Privacy Act (ECPA), the Stored Communications Act (SCA), and similar provisions of Hawaii law. *Id.* at ¶¶ 40–41. Jass alleges specifically that around mid-July 2019, he discovered that his business

email accounts (hjass@superb.net and hjass@hopone.net) had been altered and copies of the emails sent to those particular email addresses were being directed to the email addresses jgulban@superb.net and jralph@superb.net. *See id.* at ¶ 42. Jass also avers that CherryRoad, under the direction of Gulban and Visco, "hijacked" his *personal* email account (hj@superb-e.com), which he had used for twenty-five years exclusively for personal communications. *Id.* at ¶¶ 43–44, 57. All of the emails sent to Jass' personal email account were allegedly forwarded by CherryRoad to hjass@smail1.superb.net (the destination for Jass' business email accounts) and jgulban@superb.net, an account that belonged to Gulban. *Id.* at ¶ 43.

When Jass discovered that CherryRoad had intercepted or accessed his private email, he complained several times to Gulban, Visco, and Joe Ralph (another CherryRoad manager). *Id.* at ¶ 45. Without notice, CherryRoad then deleted Jass' personal email account, hj@superb-e.com. As a result, numerous emails bounced back to the sender; Jass was unable to access personal healthcare, banking and other online services, which require two-factor authentication; and Jass lost vendor statements, invoices and personal email. *Id.* at ¶ 46.

Fifth, sometime before the end of July 2019, Jass made several complaints that conduct by Gulban, Visco and others at CherryRoad potentially violated contracts between CherryRoad and the State of Hawaii. *Id.* at ¶ 49. In particular, Jass complained that CherryRoad was violating certain contract provisions with the

State of Hawaii that: (1) prohibited employment discrimination on the bases covered by state or federal law; (2) proscribed referencing the State of Hawaii in CherryRoad's advertisements; (3) required "Compliance with Laws"; and (4) mandated rigorous security training for all employees. *Id.* at ¶¶ 50–53.

In response to Jass' complaints, Jass avers that Gulban and Visco intensified their "concerted and retaliatory actions." *Id.* at ¶ 54. Throughout July 2019, Gulban and Visco allegedly placed "unrealistic job demands" on Jass, compounded by Jass' restricted access to the systems and emails necessary for him to fulfill these demands. *Id.* at ¶ 55. For example, during the last week of July 2019, Jass claims Gulban and Visco forced him to prepare an activity report requiring twenty hours of work, in addition to other mandatory assignments, even though Jass had been preapproved for a vacation during that week to spend time with his ailing mother. *Id*. Then, in late July 2019, Jass alleges Visco threatened that he and Gulban would "shut down Superb" and leave Jass with any resulting liabilities, including CherryRoad customer chargebacks and non-performance of services on Superb Internet Corporation merchant accounts used by CherryRoad, for which Jass was a personal guarantor. *Id.* at ¶ 48.

Tensions eventually came to a head on August 21, 2019, when Gulban and Visco verbally terminated Jass' employment, effective August 31, 2019, and informed Jass that the termination was for "cause." *Id.* at ¶¶ 19, 61. According to

Jass, he did not receive a "written notice" explaining the basis for the termination decision, or a "reasonable opportunity" to cure. *Id.* at ¶¶ 22, 25. In fact, Jass alleges Defendants did not have cause to terminate his employment and instead threatened him and then eventually terminated his employment due to his protected activities as a whistleblower. *Id.* at ¶¶ 24, 31, 39, 66–68, 78–80.

## B. Procedural History

On September 21, 2019, Jass filed an employment discrimination charge with the Hawaii Civil Rights Commission (HCRC Charge), Dkt. No. 5-1.[3] In the HCRC Charge, Jass asserts that Defendants: (1) discriminated against him because of his sexual orientation, and (2) "retaliated" against him because he "engaged in protected activity" by complaining to Gulban and CherryRoad about how they discriminated against "minorities in the company." Dkt. No. 5-1. ¶¶ 15, 27–36.

On September 30, 2019, Jass filed suit in state court, asserting three claims under Hawaii law: (1) breach of contract; (2) retaliation in violation of Hawaii's Whistleblower Protection Act, Haw. Rev. Stat. § 378-62; and (3) civil conspiracy by Gulban and Visco to "force [Jass'] termination" and to "silence, discredit, and threaten [Jass]." Dkt. No. 4-4 at 16, 18–20; *id.* at ¶ 86. On November 7, 2019,

---

[3]In ruling on a motion to dismiss under Rule 12(b)(6), a court may take judicial notice of "undisputed matters of public record," *Harris v. Cty. of Orange*, 682 F.3d 1126, 1131–32 (9th Cir. 2012), such as "records and reports of administrative bodies." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1001 (9th Cir. 2018) (quoting *United States v. Ritchie*, 342 F.3d 903, 907–09 (9th Cir. 2003)).

Defendants timely removed the case to federal court and invoked 28 U.S.C. § 1332 as the basis for subject matter jurisdiction. Dkt. No. 1, ¶ 6. Defendants now seek to dismiss all claims. Dkt. No. 5 at 2.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim becomes plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "[L]abels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted). Dismissal is therefore appropriate "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 886 (9th Cir. 2018) (quoting *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017)).[4]

---

[4]Defendants also seek dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction on the grounds that Jass failed to exhaust his administrative remedies as required under Title VII or the Hawaii analogue. Dkt. No. 5 at 6–7. But Rule 12(b)(1) is inapplicable. That rule only applies to matters that are considered jurisdictional. *See, e.g.*, *Seismic Reservoir 2020, Inc. v. Paulsson*, 785 F.3d 330, 333 (9th Cir. 2015); *Inlandboatmens Union of the Pac. v. Dutra Group*, 279 F.3d 1075, 1078 n.2 (9th Cir. 2001). It is well established that Title VII's administrative exhaustion

# DISCUSSION

## I. Failure to Exhaust Administrative Remedies

Defendants argue Jass failed to exhaust administrative remedies before filing this lawsuit. Dkt. No. 5 at 6–7. Although Jass has only *explicitly* alleged claims for breach of contract; retaliation in violation of Section 378-62 of the HWPA, Haw. Rev. Stat. §§ 378-61 to 378-69; and civil conspiracy, Dkt. No. 4-4 at 16–19, Defendants contend that Jass' HWPA claim is subject to administrative exhaustion because the facts alleged assert an employment retaliation claim under Haw. Rev. Stat. § 378-2(a)(2), and Jass is attempting to avoid exhausting administrative relief by simply "redesigning" his claim as one under the HWPA. *See* Dkt. No. 5 at 7;

---

requirements are not jurisdictional. *See, e.g.*, *Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1846 (2019) ("Prerequisites to suit like Title VII's charge-filing instruction . . . are properly ranked among the array of claim-processing rules that must be timely raised to come into play."); *Zipes v. Trans World Airlines, Inc.*, 455 U. S. 385, 393 (1982) ("filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court"). "Whether a plaintiff in a Title VII action has timely exhausted her administrative remedies is an affirmative defense, [so] the defendant bears the burden of pleading and proving it." *See, e.g.*, *Kraus v. Presidio Tr. Facilities Div./Residential Mgmt. Branch*, 572 F.3d 1039, 1046 n.7 (9th Cir. 2009) (citation and internal quotation marks omitted)); *see also Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 902 (9th Cir. 2013) ("[P]laintiffs ordinarily need not plead on the subject of an anticipated affirmative defense."). Moreover, state law may not "control or limit" the subject matter jurisdiction of the federal courts. *United States Fidelity & Guaranty Co. v. Lee Investments, LLC*, 641 F.3d 1126, 1133 (9th Cir. 2011) (quoting *Begay v. Kerr-McGee Corp.*, 682 F.2d 1311, 1315 (9th Cir. 1982)). Thus, even where a claim would be jurisdictionally barred in state court, "that issue cannot be raised by a Rule 12(b)(1) motion; instead, the state law bar must be raised as a merits defense, *i.e.*, by a motion to dismiss for failure to state a claim under Rule 12(b)(6), or by a motion for summary judgment under Rule 56." *See, e.g.*, 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 12.3(1) (Matthew Bender 3d ed. 2020); *Odom v. Penske Truck Leasing Co., L.P.*, 893 F.3d 739, 742–744 (10th Cir. 2018). Accordingly, Rule 12(b)(1) is irrelevant to the issues presented in Defendants' motion to dismiss.

Dkt. No. 11 at 4–5.[5]

Thus, the question is whether an HWPA claim based on facts that could also support a retaliation claim under Section 378-2(a)(2) is subject to administrative exhaustion. As explained below, the Court concludes that although the HWPA does not contain an administrative exhaustion requirement and the majority of Jass' claims are not subject to administrative exhaustion, Jass' claim that he was subjected to retaliation because he complained about how minorities were treated at the company falls under Section 378-2(a)(2), regardless of how Jass has labeled it. Therefore, Jass must exhaust administrative remedies to pursue this claim.

It is well established that before an aggrieved employee may file a lawsuit asserting employment discrimination claims under either Title VII of the Civil Rights Act of 1964 or the Hawaii Employment Practices Act (HEPA), Haw. Rev. Stat. § 378-1 *et seq.*, he or she must first exhaust administrative remedies by filing a timely charge with the Equal Employment Opportunity Commission or appropriate state agency, like the HCRC,[6] and by receiving a right-to-sue letter. *See, e.g.*, 42 U.S.C. § 2000e-5(e)(1), (f)(1); *Scott v. Gino Morena Enters., LLC*, 888 F.3d 1101,

---

[5]Defendants also argue that Title VII provisions cover Jass' claims. But Jass has not invoked Title VII's remedies. Moreover, Defendants have not argued or shown that Title VII preempts employment discrimination claims or that Congress was concerned with employment discrimination claims asserted solely under state law. Therefore, the Court only addresses the tension between Section 378-2(a)(2) and the HWPA.

[6]"If the state or local agency has a 'worksharing' agreement with the EEOC, a complainant ordinarily need not file separately with federal and state agencies." *Davis*, 139 S. Ct. at 1846.

1104, 1106 (9th Cir. 2018); Haw. Rev. Stat. § 378-4 (incorporating the procedures set forth in chapter 368); Haw. Rev. Stat. §§ 368-11, 368-12; *see Schefke v. Reliable Collection Agency, Ltd.*, 32 P.3d 52, 60 n.5 (Haw. 2001) (citing HRS §§ 368-11, 368-12, and 378-4); *Ross v. Stouffer Hotel Co.*, 879 P.2d 1037, 1043 (Haw. 1994).[7]

The Hawaii Supreme Court, however, has not decided whether a claimant under the HWPA is required to present his claims to the HCRC before filing suit, nor have the parties directed the Court to any binding authority addressing whether an HWPA claim is subject to administrative exhaustion requirements when the claim is premised on facts that sound in retaliation under Section 378-2(a)(2). Dkt. No. 5 at 7; Dkt. No. 10 at 4; Dkt. No. 11 at 4–5. Therefore, the Court must "predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *PSM Holding Corp. v. Nat'l Farm Fin. Corp.*, 884 F.3d 812, 820 (9th Cir. 2018) (internal quotation marks omitted)); *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 76–79 (1938).

---

[7]"[T]he federal courts' interpretation of Title VII is useful in construing Hawaii's employment discrimination law," *Lales v. Wholesale Motors Co.*, 328 P.3d 341, 356 (Haw. 2014) (quoting *Sam Teague, Ltd. v. Haw. Civil Rights Comm'n*, 971 P.2d 1104, 1116 (Haw. 1999)), and thus, the Hawaii Supreme Court "look[s] to their decisions for guidance." *Id.* (quoting *Furukawa v. Honolulu Zoological Soc.*, 936 P.2d 643, 649 (Haw. 1997)); *Shoppe v. Gucci America, Inc.*, 94 Haw. 14 P.3d 1049, 1058 (Haw. 2000) ("In interpreting HRS § 378-2 in the context of race and gender discrimination, we have previously looked to the interpretations of analogous federal laws by the federal courts for guidance.").

## A. The HWPA Does Not Contain an Administrative Exhaustion Requirement

The HWPA itself does not require plaintiffs to exhaust administrative remedies. Indeed, Defendants do not contend that the HWPA contains such a requirement. Section 378-62 of the HWPA provides, in relevant part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
>
> > (1) The employee, or a person acting on behalf of the employee, reports or is about to report to the employer, or reports or is about to report to a public body, verbally or in writing, a violation or a suspected violation of:
> >
> > > (A) A law, rule, ordinance, or regulation, adopted pursuant to law of this State, a political subdivision of this State, or the United States; or
> > >
> > > (B) A contract executed by the State, a political subdivision of the State, or the United States, unless the employee knows that the report is false . . .

Haw. Rev. Stat. § 378-62. Nothing in Section 378-62 or any other section of the HWPA suggests that a claimant is required to exhaust administrative relief.

First, the HWPA does not incorporate the HCRC exhaustion procedures under chapter 368. Employment claims under Section 378-2 are subject to administrative exhaustion requirements by virtue of Section 378-4, which incorporates by reference the HCRC exhaustion procedures under chapter 368. The HWPA does not contain the same reference. Moreover, Section 378-4 is contained in part I of chapter 378

and grants the HCRC "jurisdiction over **the subject of discriminatory practices made unlawful by this part**," which spans Sections 378-1 to 378-6. Haw. Rev. Stat. § 378-4 (emphasis added); *see also* Haw. Rev. § 368-11(a), (d) (providing that the HCRC "shall have jurisdiction over the subject of discriminatory practices made unlawful by part I of chapter 489, chapter 515, part I of chapter 378, and this chapter"). But Section 378-62 of the HWPA is codified in *part V* of chapter 378. Further, nothing in the HWPA grants the HCRC jurisdiction over claims brought under Section 378-62 or any other section of part V.

Second, the limitations period for HWPA claims reinforces that such claims are not subject to exhaustion requirements. This is because claims under Section 378-2 are subject to a different statute of limitations period than HWPA claims. A claimant under Section 378-2 must file a complaint with the HCRC within 180 days of the unlawful discriminatory practice or the last occurrence of a pattern of ongoing discrimination, *see* Haw. Rev. Stat. § 368-11(c), and then file a lawsuit in court within ninety days of receiving a right-to-sue notice. *Id.* § 368-12; *Ross*, 879 P.2d at 1043. By contrast, an HWPA plaintiff is required to bring his claim "within two years after the occurrence of the alleged violation." Haw. Rev. Stat. § 378-63(a) (emphasis added); *see Andrade v. Cty. of Hawaii*, 451 P.3d 1, 13 (Haw. Ct. App. 2019) (noting that the limitation period is triggered by the "adverse action taken by the employer because of the employee's protected activity").

A court's "inquiry ceases if the statutory language is unambiguous and the statutory scheme is coherent and consistent." *Sebelius v. Cloer*, 569 U.S. 369, 380 (2013) (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002)). The text of the HWPA is clear: Nothing requires an HWPA plaintiff to submit his claim to the HCRC before filing a lawsuit.

To reach a contrary conclusion, Defendants rely on *Linville v. Hawaii*, 874 F. Supp. 1095, 1104 (D. Haw. 1994) and *Lalau v. City & County of Honolulu*, 938 F. Supp. 2d 1000, 1020 (D. Haw. 2013). Dkt. No. 5 at 7. But neither case dictates that an HWPA plaintiff must exhaust administrative remedies.

In *Linville*, a state employee brought federal and state employment discrimination claims against the State of Hawaii. 874 F. Supp. at 1000, 1102. After the court held that the plaintiff's state law claims for emotional distress, negligence, and violation of state statutory law were barred by sovereign immunity under the Eleventh Amendment, *id.* at 1103–04, the court stated in a footnote that because the plaintiff had "not presented th[e] Court with notice [that she had received a] right-to-sue under H.R.S. §§ 378-2 and 378-62," the plaintiff's "claims under these provisions must *also be dismissed as premature*." *Linville*, 874 F. Supp. at 1104 n.4 (emphasis added). In support, the court cited Haw. Rev. Stat. § 378-4. *Linville*, 874 F. Supp. at 1104 n.4. Not only is footnote four in *Linville* dicta, but, as explained above, Section 378-4 has no bearing on claims under the HWPA.

In *Lalau*, the court did not decide the issue here. There, the court discussed the practical problems involved with "read[ing] into Hawaii Revised Statutes an exhaustion requirement" for HWPA claims and refused to do so, but the court ultimately did not "actually decide" the issue because the court concluded that plaintiff's HWPA claim was barred by the statute of limitations, and plaintiff had failed to establish causation. 938 F. Supp. 2d at 1020–22; *see also You v. Longs Drugs Stores Cal., LLC*, 937 F. Supp. 2d 1237, 1256–58 (D. Haw. 2013) (providing a similar discussion of the issue but eventually concluding that plaintiff's claim failed on the merits).

Therefore, in light of the plain text of the HWPA, the Court holds that HWPA claims are not subject to exhaustion requirements, and the Hawaii Supreme Court would likely reach the same conclusion.

### B. The HWPA Cannot Be Used to Disguise Section 378-2(a)(2) Claims

While the HWPA does not require administrative exhaustion, Jass cannot avoid the administrative exhaustion requirements for Section 378-2(a)(2) retaliation claims by rebranding such a claim as one brought under the HWPA.

Under Haw. Rev. Stat. § 378-2(a)(2), an employer is prohibited from retaliating "against any individual because the individual has opposed any practice forbidden by this part." Here, Jass alleges that he "made several complaints to [CherryRoad] and Gulban regarding how they were treating minorities in the

Company, which [Jass] reasonably believed was discriminatory and illegal," and that he "was eventually terminated due to his protected activity as a whistleblower." Dkt. No. 4-4, ¶¶ 29, 31. Jass is clearly asserting a retaliation claim for opposing an "unlawful discriminatory practice." *See* Haw. Rev. Stat. §§ 378-2(a)(2), 368-11(d). Any other conclusion would elevate form over substance. To be sure, Jass filed this same charge with the HCRC on September 21, 2019, Dkt. No. 5-1, claiming *inter alia*, that Defendants "retaliated" against him because he "engaged in protected activity" by complaining to Gulban and CherryRoad about "how [they] were treating minorities in the company." Dkt. No. 5-1. ¶¶ 15, 27–36. And it is undisputed that Jass has not yet received a right-to-sue letter from the EEOC or the HCRC, Dkt. No. 5 at 6–7; *see* Dkt. No. 10 at 4. As such, Jass must exhaust the administrative process on which he has already embarked.

The Court is cognizant that at least one court has concluded otherwise. *Grant v. Marriott Ownership Resorts, Inc.*, No. 16-00451 LEK-RLP, 2018 WL 6112963, at *30–31 (D. Haw. Nov. 21, 2018) (adopting the reasoning in *Lalau* and concluding "that HWPA claims are not subject to the exhaustion requirement for either a Title VII claim or a § 378-2 claim, even when the facts giving rise to the HWPA claim could have supported a retaliation claim under either Title VII or § 378-2(a)(2)."). This Court, however, cannot agree in light of the fact that the Hawaii legislature clearly intended plaintiffs to submit Section 378-2(a)(2) retaliation claims to the

HCRC and exhaust their administrative remedies prior to filing suit. *See Schefke*, 32 P.3d at 60 n.5 (citing Haw. Rev. Stat. §§ 368-11, 368-12, and 378-4); *Ross*, 879 P.2d at 1043. That legislative purpose is frustrated if the HCRC's administrative process can be defeated by employees simply placing a different label on their claims. Of course, the HWPA protects an employee from retaliation by an employer for reporting a violation of a "law, rule, ordinance, or regulation" and Section 378-2 and Title VII are "laws" that proscribe the discrimination Jass allegedly complained about to Defendants. But that apparent overlap between the HWPA and Section 378-2(a)(2) does not overcome two longstanding canons of statutory interpretation.

First, "[g]eneral language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with," *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 646 (2012), and the same principle has been applied to resolve conflict between two statutes. *See, e.g.*, *United States v. Estate of Romani*, 523 U.S. 517, 532 (1998); *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.").[8] Thus, the more specific provision in Section 378-2(a)(2) controls.

---

[8]*See also State v. Hoshijo*, 76 P.3d 550, 558 (Haw. 2003) ("[W]here there is a 'plainly irreconcilable' conflict between a general and a specific statute concerning the same subject matter, the specific will be favored. . . . Where the statutes simply overlap in their application,

Second, "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . ." *See Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).[9]   As such, the Court will not carve out an exception to the administrative exhaustion requirements for a Section 378-2(a)(2) retaliation claim disguised under the HWPA because that would effectively nullify a portion of Hawaii's statutory regime.  Legislatures speak to such major issues directly.  A legislature "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

In sum, Jass' HWPA claim may proceed, but only to the extent the five categories of complaints that form the basis of that claim does not rely on the theory that Jass complained about discrimination toward minorities.  To proceed on that theory, Jass must first exhaust his administrative remedies.

## II.     Claims Against Cherry Road (Counts I and II)

### A.     Liability Under the Joint Employer and Alter Ego Theories

In the complaint, Jass asserts claims for breach of contract and violation of

---

effect will be given to both if possible, as repeal by implication is disfavored." (ellipsis in original; citations and internal quotation marks omitted)).

[9] *See also Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385–86 (2013) (noting that the presumption against surplusage may guide interpretation of "redundancies across statutes," but the canon is "strongest when an interpretation would render superfluous another part of the same statutory scheme").

the HWPA against CherryRoad. Dkt. No. 4-4 at 16, 18. Because the Agreement is only between SMC and Jass, *see* Dkt. No. 5-2 at 2, CherryRoad contends that it could not have been Jass' employer, and the claims should therefore be dismissed. *See* Dkt. No. 5 at 8–9; Dkt. No. 11 at 5–6. The complaint does not identify any legal theory for fastening liability to CherryRoad, other than that SMC is "an entity controlled by [CherryRoad]." Dkt. No. 4-4, ¶¶ 13, 15. Notwithstanding this ambiguity, Jass directs the Court to *United States EEOC v. Global Horizons, Inc.*, 915 F.3d 631 (9th Cir. 2019) and argues that CherryRoad is potentially liable as a "joint employer" with SMC. Dkt. No. 10 at 4. CherryRoad responds, however, that the "joint employer" analysis is irrelevant in the context of a breach of contract claim. Dkt. No. 11 at 6.

As explained below, the Court concludes that the "joint employer" theory may appropriately be applied to claims brought under the HWPA and that Jass has alleged sufficient facts to show that CherryRoad was Jass' joint employer for purposes of liability under the HWPA. However, because the joint employer framework evaluates whether a particular defendant exerted "control" over the terms and conditions of an individual's work, *see infra* Section II.A.1, the joint employer theory is inapplicable in the context of a breach of contract claim. For breach of contract claims, the "alter ego" theory provides the proper framework, *see infra* Section II.A.2, because it addresses whether "a corporation is the mere

instrumentality or business conduit of another corporation or person" so as to allow a plaintiff "to reach a second corporation or individual upon a cause of action that otherwise would have existed only against the first corporation . . . , such as a tort or breach of contract." *See Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe Transp. Co.*, 982 P.2d 853, 869–70 (Haw. 1999) (citations and internal quotation marks omitted), *superseded by statute on other grounds as noted in Davis v. Four Seasons Hotel Ltd.*, 228 P.3d 303, 308 n.9 (Haw. 2010).[10]

## 1. Joint Employer for Purposes of the HWPA

"It is now well-settled that an individual can have more than one employer for Title VII purposes." *Global Horizons*, 915 F.3d at 637 (collecting cases). The question before the Ninth Circuit in *Global Horizons* was "what test to adopt for determining whether an entity is a joint employer" under Title VII. *Id.* at 637–38. The court concluded that "the common-law agency test should be applied in the Title VII context" to analyze "an employer-employee relationship" because Supreme Court precedent dictated that "the common-law test governs when a statute does not meaningfully define terms like 'employer' and 'employee.'" *Id.* at 638–39 (citing *Clackamas Gastroenterology Associates, P.C. v. Wells*, 538 U.S. 440, 444–45 (2003); *Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318, 322–23 (1992)).

---

[10]Although Jass' complaint does not explicitly invoke the "alter ego" theory, the "[f]ederal pleading rules . . . do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 135 S. Ct. 346 (2014).

Under the common-law agency test, "'the principal guidepost' is **the element of control**—that is, 'the extent of control that one may exercise over the details of the work of the other.'" *Global Horizons*, 915 F.3d at 638 (emphasis added) (quoting *Clackamas*, 538 U.S. at 448). Whether the requisite degree of control exists is determined by considering the following non-exhaustive list of twelve (12) factors, "with no one factor being decisive":

> [1] the skill required; [2] the source of the instrumentalities and tools; [3] the location of the work; [4] the duration of the relationship between the parties; [5] whether the hiring party has the right to assign additional projects to the hired party; [6] the extent of the hired party's discretion over when and how long to work; [7] the method of payment; [8] the hired party's role in hiring and paying assistants; [9] whether the work is part of the regular business of the hiring party; [10] whether the hiring party is in business; [11] the provision of employee benefits; and [12] the tax treatment of the hired party.

*Id.* at 638 (quoting *Darden*, 503 U.S. at 323–24). A complaint must contain sufficient factual allegations to plausibly establish that a defendant is a joint employer under the common-law agency test. *See id.* at 639–41 (holding that the EEOC had plausibly alleged that fruit growers and a labor contractor were joint employers under Title VII as to non-orchard-related matters).

The issue here, as emphasized above, is that Jass is not asserting claims under Title VII or its Hawaii analogue. Moreover, Jass has not directed the Court to any case in which the Hawaii Supreme Court, or any other court for that matter, has held a "joint employer" liable for a breach of contract or violation of the HWPA.

Notwithstanding, the Court concludes that the "joint employer" theory is applicable to Jass' claim under the HWPA. In *Lales*, the Hawaii Supreme Court noted that the definition of "employer" under Title VII is "substantially similar" to that in Section 378-1. *See Lales*, 328 P.3d at 356. Thereafter, this Court applied the reasoning set forth in *Lales* to the HWPA and concluded that the meaning of "employer" under Section 378-1 and under the HWPA is the same. *Onodera v. Kuhio Motors, Inc*., No. 13-00044-DKW, 2014 WL 1031039, at *7–8 (D. Haw. Mar. 13, 2014); *Ragasa v. Cty. of Kaua'i*, No. 14-00309-DKW-BMK, 2015 WL 5472866, at *3–4 (D. Haw. Sept. 15, 2015).[11] As such, it follows that the common-law agency test adopted in *Global Horizons* is also appropriate in the context of claims under the HWPA. The same cannot be said for breach of contract claims. It makes no sense to determine the parties to a contract based on the degree of control an entity exercises over the affairs of an employee's workplace. Thus, Jass must show that CherryRoad is the alter ego of SMC to sustain his breach of contract claim. *See infra* Section II.A.2.

Applying the "common-law agency" test here, Jass has adequately alleged that CherryRoad exercised "control over the details of [Jass'] work'" such that

---

[11]*Compare* Haw. Rev. Stat. § 378-61, *with* Haw. Rev. Stat. § 378-1. Other courts have followed *Onodera*. *See, e.g.*, *Ritchie v. Hawai'i*, No. 14-00046-LEK, 2014 WL 4905336, at *8 (D. Haw. Sept. 30, 2014); *Hillhouse v. Hawaii Behavioral Health, LLC*, No. 14-00155 LEK-BM, 2014 WL 4662378, at *8 (D. Haw. Sept. 18, 2014).

CherryRoad may be considered a "joint employer" for purposes of liability under the HWPA. *Global Horizons*, 915 F.3d at 638 (emphasis added) (quoting *Clackamas*, 538 U.S. at 448). According to the allegations in the complaint, Jass would receive a bonus according to "the CherryRoad Technologies Inc. 2019 Bonus Plan," Dkt. No. 4-4, ¶ 17; CherryRoad "strip[ped] Jass of his duties as President," "demoted" Jass "per the [CherryRoad] organizational chart," and changed Jass' status from "an exempt to non-exempt employee," *id.* at ¶¶ 36–37, 73; CherryRoad's CEO and CFO (Defendants Gulban and Visco, respectively) "placed unrealistic job demands on [Jass]" and "forced [Jass] to work through a preapproved vacation . . . to prepare an activity report," *id.* at ¶ 55, and it was CherryRoad's Gulban and Visco who decided and ultimately informed Jass that his employment was terminated. *Id.* at ¶¶ 61–62. As the Supreme Court has observed, an "employer can hire and fire employees, can assign tasks to employees and supervise their performance, and can decide how the profits and losses of the business are to be distributed." *Clackamas*, 538 U.S. at 450. Therefore, accepting Jass' factual allegations as true, and in light of the reality that the common-law agency test is a "fact-intensive" inquiry, at the pleading stage, Jass' allegations are enough to give rise to the "reasonable inference" that CherryRoad was Jass' joint employer with SMC for purposes of liability under the HWPA. *Iqbal*, 556 U.S. at 678–79.

## 2.    The Alter Ego Doctrine for Breach of Contract Purposes

With respect to Jass' breach of contract claim against CherryRoad, the "alter ego" theory, or "piercing the corporate veil," is the appropriate framework for analyzing whether CherryRoad may be held liable for breach of the Agreement, not the "joint employer" theory.  The Court concludes, however, that Jass has failed to allege sufficient facts to show that CherryRoad is the alter ego of SMC in order to sustain his breach of contract claim.

Whether alter ego liability applies is determined by the law of the forum state. *Goodrich v. Briones* (In re *Schwarzkopf*), 626 F.3d 1032, 1037 (9th Cir. 2010).  The "alter ego" theory is "not in itself a claim for substantive relief." *Robert's*, 982 P.2d at 870 (citations and quotation marks omitted).  Rather, the alter ego theory allows courts to "look past a corporation's formal existence" to hold another corporation liable when the "corporation is the mere instrumentality or business conduit of another corporation or person." *See id.* at 869–70 (citations and internal quotation marks omitted).  In this way, a plaintiff may "reach a second corporation or individual upon a cause of action that otherwise would have existed only against the first corporation. . . . , such as a tort or **breach of contract**." *See id.* at 870 (emphasis added) (citation and quotation marks omitted).

To pursue an alter ego theory in Hawaii, a plaintiff must allege sufficient facts showing that: (1) a "corporation is not only influenced and governed by [a second

corporation], but that there is such a unity of interest . . . that the individuality, or separateness, of [the two corporations] has ceased"; and (2) "an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice." *Calipjo v. Purdy*, 439 P.3d 218, 229 (Haw. 2019) (quoting *Robert's*, 982 P.2d at 871). A "unity of interest" means "their general corporate actions are guided or determined not by two separate . . . consciousness, but one[.]" *Calipjo*, 439 P.3d at 229–30 (quoting *Robert's*, 982 P.2d at 871, 882). To guide courts in evaluating whether a corporate entity may be held liable as the alter ego of another, the Hawaii Supreme Court has identified twenty-five (25) factors to consider, with no one factor being dispositive.[12] *Robert's*,

---

[12]These factors include:

> [1] Commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses; [2] the treatment by an individual of the assets of the corporation as his own; [3] the failure to obtain authority to issue stock or to subscribe to or issue the same; [4] the holding out by an individual that he is personally liable for the debts of the corporation; [5] the identical equitable ownership in the two entities; [6] the identification of the equitable owners thereof with the domination and control of the two entities; [7] identity of . . . directors and officers of the two entities in the responsible supervision and management; [8] sole ownership of all of the stock in a corporation by one individual or the members of a family; [9] the use of the same office or business location; [10] the employment of the same employees and/or attorney; [11] the failure to adequately capitalize a corporation; [12] the total absence of corporate assets, and undercapitalization; [13] the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation; [14] the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities; [15] the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; [16] the use of the corporate entity to procure labor, services or merchandise for another person or entity; [17] the diversion stockholder [sic] or other person or entity, to

982 P.2d at 871–72.  As relevant here, the alter ego theory is a matter that is subject to scrutiny under federal pleading standards.  *See, e.g.*, *Holley v. Crank*, 400 F.3d 667, 674–75 (9th Cir. 2004); *Ovation Toys Co. v. Only Hearts Club*, 675 F. App'x 721, 724 (9th Cir. 2017) (holding that allegations in the complaint were conclusory or otherwise insufficient to establish alter ego liability).

Here, as to the first element—unity of interest or "control"—Jass merely alleges in wholly conclusory terms that SMC is "controlled by [CherryRoad]."  Dkt. No. 4-4, ¶¶ 13, 15.  That is a legal conclusion and the Court is "not bound to accept as true a legal conclusion couched as a factual allegation'" for purposes of a motion to dismiss.  *See Iqbal*, 556 U.S. at 678.  Furthermore, there are no allegations regarding the second element as Jass has not articulated any "fraud" or "injustice"

---

the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another; [18] the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal transactions; and [19] the formation and use of a corporation to transfer to it the existing liability of another person or entity.

*Robert's*, 982 P.2d at 871 (alterations in original; emphasis omitted) (quoting *Associated Vendors, Inc. v. Oakland Meat Co.*, 26 Cal. Rptr. 806, 838–40 (Cal. Dist. Ct. App. 1962)).  The court noted other factors, including:

(1) incorporation for the purpose of circumventing public policy or statutes; (2) whether the parent finances the subsidiary; (3) whether the subsidiary has no business or assets except those conveyed to it by the parent; (4) whether the parent uses the subsidiary's property as its own; (5) whether the directors of the subsidiary do not act independently in the interest of the corporation but take their orders from and serve the parent; and (6) whether the "fiction of corporate entity . . . has been adopted or used to evade the provisions of a statute."

*Id.* (quoting *Kavanaugh v. Ford Motor Co.*, 353 F.2d 710, 717 (7th Cir. 1965)).

that would result by refusing to apply alter ego liability. *Roberts*, 982 P.2d at 871.

To be sure, although "contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability" is a relevant factor, *Robert's*, 982 P.2d at 871, Jass has not alleged that this is the case here or explained why it is necessary to pierce the corporate veil in order to sustain his cause of action for breach of contract.

That leaves Jass' request for leave to amend. Dkt. No. 10 at 4, 29. Dismissal without leave to amend is appropriate "where a plaintiff's proposed amendments would fail to cure the pleading deficiencies and amendment would be futile." *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011); *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (*en banc*). While Jass has failed to adequately state a breach of contract claim against CherryRoad under an alter ego theory, the Court cannot say that the defects could not be saved by further factual allegations. Indeed, Jass has tendered exhibits and proffered additional factual allegations relevant to the *Robert's* factors that might sustain his claim under an alter ego theory.[13] Therefore, Jass' breach of contract claim (Count I) is dismissed with

---

[13]For example, Jass attached to his opposition brief: (1) a copy of the Shareholders Agreement between CherryRoad and Jass, and the Intercompany Services Agreement between CherryRoad and SMC, Dkt. No. 10-4; (2) several emails from Defendants Gulban and Visco and other CherryRoad personnel, Dkt. Nos. 10-8, 10-9, 10-10, 10-11, 10-12; and (3) a series of emails from Defendant Visco and CherryRoad's controller, requesting that Jass wire $70,000 to CherryRoad. Dkt. No. 10-14. This evidence indicates that at least one of the *Robert's* factors is present because Defendants Gulban and Visco were evidently officers of CherryRoad while also serving as two of the three members of SMC's Board of Directors. *See Robert's*, 982 P.2d at

leave to amend.  *Holley*, 400 F.3d at 675 (holding that plaintiffs should have been allowed to amend their complaint "to specifically allege the piercing of the corporate veil theory" to support their Fair Housing Act claim); *Ovation Toys*, 675 F. App'x at 723, 724 (holding that dismissal without leave to amend was inappropriate where plaintiff asserted causes of action for breach of contract, fraud, unjust enrichment, and conversion under the theory of alter ego liability).[14]

## B.   Hawaii Whistleblower Claim (Count II)

Count II of the Complaint alleges that CherryRoad violated Section 378-62 of the HWPA.  CherryRoad argues the allegations in the complaint are insufficient to state a HWPA claim.  Dkt. No. 5 at 10–13.  The Court concludes otherwise.

As noted above, the statute protects an employee from retaliation by his employer because the employee "reports or is about to report to the employer, or

---

871.

[14]To the extent CherryRoad argues that Jass' breach of contract claim should be dismissed merely because the Agreement provided that Jass could be terminated with or without cause, Dkt. No. 5 at 9–10, this alternative basis for dismissal is meritless.  The basis for Jass' claim is two-fold.  First, and most importantly, Jass alleges he was falsely terminated for "Cause" because "Cause" did not exist, as that term is defined by the enumerated circumstances of the Agreement.  Dkt. No. 4-4, ¶¶ 24, 73.  As a result, Jass did not receive the Separation Amount provided in the Agreement for a termination "without Cause."  Dkt. No. 4-4, ¶¶ 26, 73; Dkt. No. 5-2, ¶ 10(a).  Second, the Agreement provided that Jass could only be terminated for "Cause" if: (a) Jass was given "written notice specifying in reasonable detail the act(s) or omission(s) . . . constitut[ing] Cause"; and (b) "in the case of [certain enumerated categories of conduct] . . . , a reasonable opportunity for [Jass] to correct such act(s) or omission(s)," Dkt. No. 5-2, ¶ 10(e)(i)—and here, Jass alleges he did not receive any "written notice" or a "reasonable opportunity" to correct the problem.  Dkt. No. 4-4, ¶¶ 22, 25, 73.  Therefore, Jass has alleged facts to support the necessary elements of a breach of contract claim.  *See Calipjo*, 439 P.3d at 225.

. . . a public body, verbally or in writing, a violation or a suspected violation of . . . [a] law, rule, ordinance, or regulation . . . of [Hawaii]," one of its subdivisions, or the United States; or "[a] contract executed by [Hawaii]" one of its subdivisions, or the United States, "unless the employee knows that the report is false . . ." Haw. Rev. Stat. § 678-62(1). A prima facie claim for retaliation under the HWPA requires the plaintiff to sufficiently allege that: "(1) he engaged in a protected activity; (2) he was subjected to an adverse employment action; and (3) the protected activity was a 'substantial or motivating factor' in the adverse employment action." *Henao v. Hilton Grand Vacations Inc.*, 772 F. App'x 510, 511 (9th Cir. 2019) (quoting *Crosby v. State Dep't of Budget & Fin.*, 876 P.2d 1300, 1310 (Haw. 1994)). Jass has satisfied all three elements.

First, Jass engaged in several activities protected under the HWPA. In June 2019 through late July 2019, Jass alleges he reported "suspected" violations of state and federal law including, *inter alia*, tax and accounting fraud, potential consumer fraud under Hawaii's Uniform Deceptive Trade Practice Act, Haw. Rev. Stat. § 481A-1 *et seq.*, interference with personal electronic communications under the Electronic Communications Privacy Act (ECPA), 18 U.S.C. § 2510 *et seq.*, and the Stored Communications Act (SCA), 18 U.S.C. § 2701 *et seq.*, and violations of certain requirements in contracts between CherryRoad and the State of Hawaii. *See* Dkt. No. 4-4, ¶¶ 29, 32–33, 38, 40–41, 47, 49, 67, 77–78. Contrary to CherryRoad's

view, Dkt. No. 5 at 13, nothing under Hawaii law requires that Jass "specifically identify" the provision of the law he suspected Defendants to be violating or establish that a violation of the law actually occurred.

Second, Jass was subjected to an adverse employment action. Jass has alleged that he was (1) "strip[ped] . . of his duties as President"; (2) "demoted," (3) reclassified as a "non-exempt employee"; and (4) ultimately terminated. *See* Dkt. No. 4-4, ¶¶ 31, 36–37, 61, 73. Job reassignment, demotion, and termination clearly qualify as adverse employment actions because such actions affect the "conditions" of employment. *See Crosby*, 876 P.2d at 1309.

Third, there is "a causal connection between the alleged retaliation and the 'whistleblowing.'" *Crosby*, 876 P.2d at 1310. In the HWPA context, Hawaii courts have relied on Title VII retaliation cases from the Ninth Circuit and recognized that "in some cases, causation can be inferred from timing alone" where the employer has knowledge of the employee's protected conduct and "an adverse employment action follows on the heels of [the] protected activity." *See Tokashiki v. Freitas*, 132 P.3d 851, 2006 WL 995161, at *9 (Haw. 2006) (quoting *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002)); *see also Dobbs v. Cty. of Maui*, 434 P.3d 1256, 2019 WL 762407, at *4 (Haw. Ct. App. 2019). Here, causation can be inferred because at least some of the alleged retaliation immediately followed Jass' protected conduct and Jass was eventually terminated less than three months after

he first began complaining about unlawful conduct in the workplace. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1003 (9th Cir. 2009) (causation could be inferred where termination occurred two and a half months after protected activity); *Miller v. Fairchild Indus.*, 885 F.2d 498, 505 (9th Cir. 1989) (sufficient temporal proximity where discharges occurred forty-two and fifty-nine days after protected conduct); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (sufficient temporal proximity where the first adverse action took place less than three months after an employee's protected activity).

Therefore, Jass' HWPA claim against CherryRoad stands.

## III.    (Count III) Civil Conspiracy Claim Against Gulban and Visco

Count III asserts a claim for civil conspiracy against Defendants Gulban and Visco. Dkt. No. 4-4, ¶¶ 86–90. A civil conspiracy "is a combination of two or more persons [or entities] by concerted action to accomplish a criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means." *Robert's*, 982 P.2d at 881 n.28 (quoting *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 466 (1921)), *superseded by statute on other grounds as stated in Davis*, 228 P.3d at 308 n.9. "Civil conspiracy does not alone constitute a claim for relief." *Robert's*, 982 P.2d at 889 n.44. "A plaintiff must allege an actionable underlying claim upon which to base a claim of conspiracy." *Mock v. Castro*, 98 P.3d 245, 2004 WL 1977617, at *8 (Haw. 2004) (citing *Ellis v. Crockett*,

451 P.2d 814, 823 (Haw. 1969)). Moreover, since 1970, it has been "widely accepted that a plaintiff could bring suit for civil conspiracy only if he had been injured by an act that was itself tortious." *Lee Ching v. Loo Dung*, 446 P.3d 1016, 1040 (Ct. App. 2019) (quoting *Beck v. Prupis*, 529 U.S. 494, 501–03 (2000)), *cert. granted*, No. 07-1-1116-06, 2019 WL 6525163 (Haw. Dec. 4, 2019); Restatement (*Second*) of Torts § 876, cmt. b (1977); *see also Farmer ex rel. Keomalu v. Hickam Fed. Credit Union*, 224 P.3d 455, 2010 WL 466007, at *16 (Ct. App. 2010) ("For a civil conspiracy claim to be valid, an underlying tort must be shown.").

Here, Defendants sole argument is that Jass only alleged a conspiracy claim against Defendants Gulban and Visco. Dkt. No. 5 at 14. Jass' rejoinder is that Defendants Gulban and Visco acted in concert to (a) breach the Agreement, and (b) wrongfully terminate Jass' employment for his whistleblowing activities. *See* Dkt. No. 10 at 26; *cf.* Dkt. No. 4-4, ¶¶ 21, 34, 47–48, 63–65, 86–90. While Jass' rejoinder is correct, the fact remains that Jass did not assert his breach of contract and termination claims against Gulban or Visco.[15] Because Jass' claim against Gulban

---

[15]Gulban and Visco are not parties to the Agreement. *See* Dkt. No. 5-2. Moreover, this Court has applied the rationale in *Lales* and held that the HWPA does not provide for individual liability. *Onodera*, 2014 WL 1031039, at *8; *Ragasa*, 2015 WL 5472866, at *4. Other courts have followed *Onodera*. *Casumpang v. Hawaiian Commercial & Sugar Co.*, No. 12-00694 ACK-BM, 2014 WL 4322168, at *18 n.13 (D. Haw. Aug. 29, 2014), *aff'd*, 712 F. App'x 709 (9th Cir. 2018); *Ritchie*, 2014 WL 4905336, at *8 (finding "the reasoning in *Onodera* persuasive" in light of the fact that "Hawai'i courts have not ruled on the issue yet" and dismissing HWPA claim against individual capacity defendant); *Hillhouse*, 2014 WL 4662378, at *8 ("Although Hawai'i courts have not ruled on the issue yet [of whether a member of an LLC can be sued in his individual capacity under the HWPA], this Court finds the reasoning in

and Visco is a standalone civil conspiracy claim only, Count III is dismissed, albeit with leave to amend.

## CONCLUSION

For the reasons set forth herein, Defendants' Motion to Dismiss, Dkt. No. 5, is GRANTED IN PART AND DENIED IN PART.

Plaintiff may have until **May 1, 2020** to file an amended complaint, to the extent allowed herein. **The Court cautions Plaintiff that failure to file an amended complaint by May 1, 2020 and include in it those claims not dismissed herein may result in the dismissal of those claims.**

IT IS SO ORDERED.

DATED: March 27, 2020 at Honolulu, Hawaiʻi.



Derrick K. Watson
United States District Judge

---

---

*Onodera* persuasive.").