IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| HARALDS JASS,<br><br>               Plaintiff,<br><br>    vs.<br><br>CHERRYROAD TECHNOLOGIES,<br>INC., *et al.*,<br><br>               Defendants. | Case No. 19-cv-00609-DKW-RT<br><br>**ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; AND (2) GRANTING PLAINTIFF LEAVE TO AMEND THE COMPLAINT** |

Plaintiff Haralds Jass alleges that shortly after he began complaining about several potentially illegal business practices by CherryRoad Technologies, Inc., he was terminated from his position as President of Superb Management Corporation, a company allegedly "controlled" by CherryRoad.  Defendants filed a motion to dismiss certain claims in the first amended complaint, arguing Jass has failed to state a claim for civil conspiracy (Count III); aiding, abetting, or inciting discriminatory employment practices under Haw. Rev. Stat. § 378-2(a)(3) (Count VI); violation of the COBRA notice requirements under ERISA, 29 U.S.C. § 1166 (Count VII); unjust enrichment (Count VIII); and conversion (Count IX).  Dkt. No. 20 at 2–3.

Contrary to Defendants' arguments, Jass has not alleged a standalone civil conspiracy claim; individual liability is authorized under Section 378-2(a)(3); an unjust enrichment claim may be pursued because it is unclear, at this stage of the

proceedings, whether Jass has a complete and adequate remedy under his employment agreement; and unauthorized credit card transactions may be the basis for a conversion claim under Hawaii law.  However, only the plan administrator can be sued for violations of Section 1166 of ERISA, and because Jass has not offered even a conclusory allegation that CherryRoad is the "plan administrator," Count VII is dismissed.  Accordingly, Defendants' motion to dismiss is GRANTED IN PART AND DENIED IN PART, and Jass is granted leave to amend the complaint.

<b><u>FACTUAL & PROCEDURAL BACKGROUND</u></b>

**A.    Relevant Factual Allegations**

Jass was previously the principal of Superb Internet Corporation until May 1, 2019 when Jass sold the company's assets to Defendant CherryRoad Technologies, Inc. (CherryRoad).  At the same time, Jass became President of Superb Management Corporation (SMC), an entity allegedly "controlled by [CherryRoad]."  Dkt. No. 17, ¶¶ 14–15.

**1.    Terms of the Employment Agreement**

On May 1, 2019, Jass and SMC entered into an employment agreement (Agreement), Dkt. No. 5-2, with a three-year Term.  Dkt. No. 17, ¶ 18.  The Agreement provides that for the first year, Jass would be paid a base salary of $15,000 per month and be eligible for a bonus.  Dkt. No. 5-2, ¶ 4(a).  During the second and third years of the Agreement, Jass would be paid a salary of $7,500 per

month and would no longer be eligible to participate in any bonus plans. *Id.* at ¶ 4(b).

Under the Agreement, Jass' employment could "only be terminated by a majority vote of the [SMC] directors." *Id.* at ¶ 10. Jass could be terminated "without Cause at any time upon written notice," *id.* at ¶ 10(a), or "for Cause," so long as Jass was provided "written notice specifying in reasonable detail the act(s) or omission(s)" believed to constitute "Cause" and, in certain cases, "a reasonable opportunity . . . to correct such act(s) or omission(s)." *Id.* at ¶¶ 10(b), 10(e)(i) (defining "Cause" for termination). Only if Jass was terminated "without Cause" would he be entitled to receive his salary remaining for the Term of the Agreement and SMC's monthly medical insurance contribution payments. *Id.* at ¶ 10(a).

### 2.    Alleged Whistleblower Conduct

When Jass assumed his position as President of SMC, Defendant Jeremy Gulban was the Chief Executive Officer of CherryRoad. Defendant Nicholas Visco served as CherryRoad's Chief Financial Officer. Dkt. No. 17, ¶¶ 4–5. Around June 11, 2019, Jass asserts he was asked such questions as: "Why are you not a U.S. citizen?"; "What is your marital status?"; and "What is your sexual orientation?" *Id.* at ¶¶ 29, 104. Throughout Jass' employment, Gulban allegedly made comments suggesting that he and CherryRoad favored white, male, American-born, and "straight" employees over other employees outside those classes. *Id.* at ¶ 29.

Beginning sometime in June 2019 through late July 2019, Jass alleges he engaged in protected activities as a whistleblower when he complained to Defendants about suspected or perceived violations of the law related to five topics: (1) discrimination against minority employees; (2) tax and accounting fraud; (3) consumer fraud; (4) interference with personal electronic communications; and (5) contracts between CherryRoad and the State of Hawaii. *See id.* at ¶¶ 29, 32, 38, 40–54, 77.

In response, Visco allegedly threatened Jass, stating that he and Gulban would make Jass' "life miserable." *Id.* at ¶ 47. Visco further stated he would "misrepresent" Jass' work. *Id.* In fact, shortly after Jass began to voice his various concerns, including those relating to consumer fraud, Jass alleges that Gulban and Visco began to make false claims about the quality of Jass' work. *Id.* at ¶ 56. Gulban further warned that he and Visco had started a "file" on Jass, which Jass understood as an admission that he was being retaliated against and that he would eventually be terminated by Gulban, Visco, and CherryRoad. *See id.* at ¶¶ 28, 34.

Jass specifically alleges that around mid-July 2019, he discovered that his business email accounts had been altered and copies of the emails sent to those business email addresses were being directed to the email addresses jgulban@superb.net and jralph@superb.net. *See id.* at ¶ 42. Jass also avers that CherryRoad, under the direction of Gulban and Visco, "hijacked" his *personal* email

account, which he had used for twenty-five years exclusively for personal communications. *Id.* at ¶¶ 43–44, 57. All of the emails sent to Jass' personal email account were forwarded to Jass' business email accounts and to jgulban@superb.net, an account that belonged to Gulban. *Id.* at ¶ 43.

When Jass discovered that CherryRoad had intercepted or accessed his private email, he complained several times to Gulban, Visco, and Joe Ralph (another CherryRoad manager). *Id.* at ¶ 45. Without notice, CherryRoad then deleted Jass' personal email account. As a result, numerous emails bounced back to the sender; Jass was unable to access personal healthcare, banking and other online services, which require two-factor authentication; and Jass lost vendor statements, invoices and personal email. *Id.* at ¶ 46.

To make matters worse, on July 1, 2019, Defendants allegedly: (a) blocked Jass from accessing internal customer and operational systems; and (b) removed Jass from numerous internal mailing lists, such as the internal sales management email group. *Id.* at ¶¶ 35, 46–47, 58. As a result, it was difficult, if not impossible, for Jass to fulfill his obligations under the Agreement, and Jass could no longer observe Defendants' business practices or utilize the systems to voice additional concerns. *Id.* at ¶¶ 35, 58. In addition, Jass was "demoted" without forewarning or explanation when his employee status was changed from exempt to non-exempt. Jass maintains, however, that he was never paid for overtime hours associated with his non-exempt

status. *Id.* at ¶¶ 16–17, 36–37.

Throughout July 2019, Gulban and Visco allegedly placed "unrealistic job demands" on Jass, compounded by Jass' restricted access to the systems and emails necessary for him to fulfill these demands. *Id.* at ¶ 55. For example, during the last week of July 2019, Jass claims Gulban and Visco forced him to prepare an activity report requiring twenty hours of work, in addition to other mandatory assignments, even though Jass had been preapproved for a vacation during that week to spend time with his ailing mother. *Id.* Then, also in late July 2019, Jass alleges Visco threatened that he and Gulban would "shut down Superb" and leave Jass with the resulting liabilities, including CherryRoad customer chargebacks and non-performance of services on Superb Internet Corporation merchant accounts used by CherryRoad, for which Jass was a personal guarantor. *Id.* at ¶ 48.

The retaliation continued, according to Jass, when Defendants repeatedly used Jass' credit card information for their own business expenses—without authorization—and refused to repay Jass for the unauthorized charges and late fees. *Id.* at ¶¶ 68, 86–87, 130, 136–37. Defendants then continued to do so even after Jass expressly told Defendants to cease using his credit cards. *Id.* at ¶ 68. Moreover, Defendants reversed past reimbursement payments for business expenses Jass incurred with his credit cards, claiming the reimbursement payments were unauthorized. *Id.*

Tensions eventually came to a head on August 21, 2019 when Gulban and Visco verbally terminated Jass' employment, effective August 31, 2019, and informed Jass that the termination was for "cause." *Id.* at ¶¶ 19, 61. According to Jass, he did not receive a "written notice" explaining the basis for the termination decision or a "reasonable opportunity" to cure. *Id.* at ¶¶ 22, 25. In fact, Jass alleges Defendants did not have cause to terminate his employment. *Id.* at ¶¶ 23–24. Rather, Defendants retaliated against Jass and then terminated his employment due to his protected activities as a whistleblower, as well as his national origin, sexual orientation, and marital status. *Id.* at ¶¶ 31, 66–68, 77–80, 97, 103–106.

In a statement to Jass, Gulban later admitted Jass had performed his work diligently and with the company's best interests in mind. Gulban allegedly made such a statement on two occasions, the day Defendants informed Jass his employment was being terminated and then again one week later. *See id.* at ¶¶ 64, 126. But Jass' alleged difficulties did not end there.

Despite Defendants previously stating that Jass "will be eligible to elect continued [medical] coverage . . . pursuant to [the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA)], Defendants denied Jass COBRA benefits. *See id.* at ¶¶ 64, 121–26. Then, in September 2019, Jass alleges Defendants wrongfully caused his personal "WUedge" and "XEtrade" regulated financial service accounts to be closed. *Id.* at ¶¶ 68, 86.

### B.     Procedural History

On September 30, 2019, Jass filed suit in state court, asserting three claims under Hawaii law: (1) breach of contract; (2) retaliation in violation of Hawaii's Whistleblower Protection Act (HWPA), Haw. Rev. Stat. § 378-62; and (3) civil conspiracy by Gulban and Visco. Dkt. No. 4-4 at 16, 18–20; *id.* at ¶ 86. On November 7, 2019, Defendants timely removed the case to federal court and invoked 28 U.S.C. § 1332 as the basis for subject matter jurisdiction. Dkt. No. 1, ¶ 6. Defendants also filed a motion to dismiss all claims, Dkt. No. 5, which the Court granted in part and denied in part, allowing Jass leave to amend. Dkt. No. 13.

On April 15, 2020, Jass filed his First Amended Complaint (FAC), Dkt. No. 17, asserting the following nine (9) counts: (1) breach of contract (against CherryRoad); (2) retaliation in violation of the HWPA, Haw. Rev. Stat. § 378-62 (against CherryRoad); (3) civil conspiracy (against Gulban and Visco); (4) discrimination on the basis of race, sexual orientation, and marital status in violation of Haw. Rev. Stat. § 378-2(a)(1)(A) (against CherryRoad); (5) retaliation in violation of Haw. Rev. Stat. § 378-2(a)(2) (against CherryRoad); (6) aiding, abetting, or inciting discriminatory employment practices in violation of Haw. Rev. Stat. § 378-2(a)(3) (against Gulban and Visco); (7) violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, (against CherryRoad); (8) unjust enrichment (against all Defendants); and (9) conversion (against all

Defendants).  Dkt. No. 17 at 28–43.  Before the Court is Defendants' Rule 12(b)(6)

motion to dismiss Counts III, VI, VII, VIII, and IX.  Dkt. No. 20 at 2–3.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of

Civil Procedure, a complaint must "contain sufficient factual matter, accepted as

true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (internal quotation marks omitted); *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.   "[L]abels and

conclusions, and a formulaic recitation of the elements of a cause of action will not

do."  *Twombly*, 550 U.S. at 555 (citations omitted).  Dismissal is therefore

appropriate "where there is no cognizable legal theory or an absence of sufficient

facts alleged to support a cognizable legal theory."  *Interpipe Contracting, Inc. v.*

*Becerra*, 898 F.3d 879, 886 (9th Cir. 2018) (quoting *L.A. Lakers, Inc. v. Fed. Ins.*

*Co.*, 869 F.3d 795, 800 (9th Cir. 2017)).

Where the complaint is deficient, a court may deny leave to amend "due to

'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure

to cure deficiencies by amendments previously allowed, undue prejudice to the

opposing party by virtue of allowance of the amendment, [and] futility of

amendment.'"  *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  But if the pleading could "possibly be cured by the allegation of other facts," the plaintiff should be granted leave to amend.  *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (*en banc*) (citation omitted).

## DISCUSSION

Asserting various legal arguments, Defendants urge the Court to dismiss the claims in Counts III, VI, VII, VIII, and IX.  Dkt. No. 20 at 2–3; Dkt. No. 26 at 4–9. On the merits, Jass contends otherwise, but argues that as a procedural matter, Defendants' motion should be denied altogether as untimely because it was not filed "within 14 days after service" of the FAC.  *See* Fed.R.Civ.P.15(a)(3); Dkt. No. 22 at 4.  Defendants admit their motion was filed 10 days late because "the deadline simply fell through the cracks" due to "the coronavirus pandemic" and "health issues for lead trial counsel."  Dkt. No. 26 at 2.

Although the Court does not condone defense counsel's belated filing, it appears the interest of reaching an efficient resolution for all parties is best served by addressing Defendants' legal arguments for dismissal, and Jass does not argue that he will be prejudiced as a result.  *See* Dkt. No. 22 at 4.  Moreover, it is clear that the time limit under Rule 15(a) is not statutory, *i.e.*, jurisdictional.  *See, e.g.*, *Hamer v. Neighborhood Hous. Servs.*, 138 S. Ct. 13, 17 (2017).  Accordingly, the

Court will proceed to the merits of Defendants' motion, but Defendants' counsel is admonished to strictly adhere to filing deadlines in the future.

## I.   Gulban and Visco May Be Held Liable In Their Individual Capacities Under Haw. Rev. Stat. § 378-2(a)(3) – Count VI

Gulban and Visco argue they cannot be held liable under Haw. Rev. Stat. Section 378-2(a)(3) (Count VI) because "there is no individual liability for a violation of Haw. Rev. Stat. § 378-2." Dkt. No. 20 at 4–5; Dkt. No. 26 at 4–5.  Jass contends he is not seeking to hold Gulban and Visco individually liable as "employers" under subsections (a)(1) or (a)(2) of Section 378-2, but as "aiders-and-abettors of the . . . discrimination, and retaliation by the employer, CherryRoad," under Section 378-2(a)(3).  Dkt. No. 22 at 6–7; Dkt. No. 17, ¶¶ 111–18.  Because Section 378-2(a)(3) expressly authorizes individual liability, Count VI may proceed.

In relevant part, Section 378-2 provides:

(a) It shall be an unlawful discriminatory practice:

(1) Because of race, sex including gender identity or expression, sexual orientation, age, religion, color, ancestry, disability, marital status, arrest and court record, reproductive health decision, or domestic or sexual violence victim status if the domestic or sexual violence victim provides notice to the victim's employer of such status or the employer has actual knowledge of such status:

(A) **For any employer** to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment;

. . . .

(2) **For any employer**, labor organization, or employment agency to discharge, expel, or otherwise discriminate against any individual because the individual has opposed any practice forbidden by this part or has filed a complaint, testified, or assisted in any proceeding respecting the discriminatory practices prohibited under this part;

(3) **For any person, whether an employer, employee, or not**, to aid, abet, incite, compel, or coerce the doing of any of the discriminatory practices forbidden by this part, or to attempt to do so . . .

Haw. Rev. Stat. § 378-2(a)(1)–(3) (emphasis added). Although the language in subsection (3) appears to plainly authorize individual liability in the context described, Defendants contend this interpretation was foreclosed by the Hawaii Supreme Court's decision in *Lales v. Wholesale Motors Co.*, 328 P.3d 341 (Haw. 2014). Dkt. No. 20 at 4–5; Dkt. No. 26 at 4. Defendants misinterpret *Lales.*

In *Lales*, the Hawaii Supreme Court held that "[i]ndividual employees are . . . not personally liable as 'employers' for harassment and retaliation claims under HRS §§ 378-2(1)(A) and 378-2(2)." *Lales*, 328 P.3d at 353.[1] The court explicitly declined to reach the issue of individual liability under Section 378-2(3) because the plaintiff failed to raise such a claim in his amended complaint or in his responses to the defendants' motions for summary judgment, or in his petition to the court of

---

[1] Effective January 1, 2012, these provisions were subsequently renumbered as subsections (a)(1)(A) and (a)(2), and the prohibition against aiding and abetting was renumbered as subsection (a)(3). *See* Act of July 8, 2011, No. 229, § 2, 2011 Haw. Sess. Laws Act 206, 676 (codified as amended at Haw. Rev. Stat. § 378-2); *see also Lales*, 328 P.3d at 344 n.10.

appeals.  *Id.* at 352 n.9.  Nonetheless, the court noted that "the legislature imposed aider-and-abettor liability on employees in [Section] 378-2(3)," *id.* at 354, and, thus, "the legislature clearly knew how to include employees within a statute's scope and its failure to do so explicitly throughout the statute suggests that employees are only held liable for infractions under [Section] 378-2(3)."  *Id.* at 354 (quoting *White v. Pacific Media Group, Inc.*, 322 F. Supp. 2d 1101, 1114 (D. Haw. 2004) (Ezra, J.)).  "Based on [the] history of the definition of 'employer' under [Section] 378-1, and the legislature's express proscription of individual employee conduct under the aider-and-abettor provision in [Section] 378-2(3)," the court concluded that "in using the term 'agent,' the legislature did nothing more than ensure that employers would be liable for the discriminatory conduct of their agents."  *Lales*, 328 P.3d at 356; *see id.* at 357–58 ("Hawaii's employment discrimination law has proscribed individual employee conduct only to the extent that the employee aids, abets, incites, compels, or coerces discriminatory conduct.  HRS § 378-2(3). . . .  [T]here is no indication that the legislature also sought to extend liability to individual employees for harassment and retaliation claims under [Sections] 378-2(1)(A) and 378-2(2), respectively.").

Therefore, contrary to Defendants' assertion, *Lales* only held that individual liability is unavailable under subsections (a)(1) and (a)(2) of Section 378-2.  Nothing in *Lales* forecloses individual liability under subsection (a)(3).  In fact, *Lales*

suggests the contrary is true. Although *Lales*' discussion of individual liability under subsection (3) is dicta, the Court in *Lales* observed that Section 378-2(a)(3) "express[ly]" provides for individual liability. *Id.* at 356. Indeed, unlike subsections (a)(1)(A) and (a)(2) that impose liability only on "an employer," Section 378-2(a)(3) provides that "any person, whether an employer, employee, or not," may be held liable if the individual acts to "aid, abet, incite, compel, or coerce" any prohibited discriminatory practice. Haw. Rev. Stat. § 378-2(a)(3). There may be reasons to question whether it is logical for the Hawaii legislature to impose liability on individuals who aid, abet, or incite discrimination, and yet simultaneously shield the individual agents who engage in the discrimination. But the wisdom of Section 378-2(a)(3) is not a proper issue before the Court. *See Griswold v. Connecticut*, 381 U.S. 479, 482 (1965) (noting that courts "do not sit as a super-legislature to determine the wisdom, need, and propriety of laws that touch economic problems, business affairs, or social conditions"). "It is the duty of the courts to enforce the judgment of the Legislature, however much [a court] might question its wisdom or fairness." *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 483–84 (1992); *accord Asato v. Procurement Policy Bd.*, 322 P.3d 228, 246 (Haw. 2014); *Matson Terminals v. Hasegawa*, 512 P.2d 1, 2 (Haw. 1973). Where, as here, "the statutory text is plain and unambiguous," a court "must apply the statute according to its terms." *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009) (citations omitted).

Here, the Hawaii legislature has plainly provided for individual liability by virtue of the express language of Section 378-2(a)(3).[2]  Count VI is brought against Defendants Gulban and Visco under Section 378-2(a)(3), not subsections (a)(1)(A) or (a)(2).  Dkt. No. 17, ¶ 12.  Thus, Gulban and Visco may be held liable as individual employees under Section 378-2(a)(3).  Count VI therefore stands.

## II.    Conversion (Against All Defendants) – Count IX

It is well established under Hawaii law that "[a]ny distinct act of dominion wrongfully exerted over one's property in denial of his right, or inconsistent with it, is a conversion."  *Tsuru v. Bayer*, 25 Haw. 693, 696 (Haw. 1920) (citation omitted).  To state a claim for conversion, a plaintiff must allege four elements: "(1) [a] taking from the owner without his consent; (2) an unwarranted assumption of ownership; (3) an illegal use or abuse of the chattel; and (4) a wrongful detention after demand."  *Freddy Nobriga Enters. v. State*, 295 P.3d 993, 999 (Haw. Ct. App. 2013) (quoting

---

[2]Hawaii courts have not explicitly held that claims against individuals who are not employers are cognizable under Section 378-2(a)(3).  *See Lales*, 328 P.3d at 352 n.9; *id.* at 348–49 (discussing *Schefke v. Reliable Collection Agency, Ltd.*, 32 P.3d 52, 86 (Haw. 2001), and observing that it is "not clear whether th[e] court was addressing [defendants'] individual liability under [Sections] 378-2(1) and (2), or under Section 378-2(3)").  However, the consensus among federal courts in this district that have necessarily decided the issue is that individual liability may attach.  *See, e.g.*, *Begley v. Cty. of Kauai*, No. 16-00350 LEK KJM, 2018 WL 3638083, at *4 (D. Haw. July 31, 2018); *Turner v. Dep't of Educ. Haw.*, 855 F. Supp. 2d 1155, 1178–79 (D. Haw. 2012) (Kay, J.) (noting that "individual liability is clearly proper under § 378-2(3)"); *Maizner v. Haw., Dep't of Educ.*, 405 F. Supp. 2d 1225, 1239 (D. Haw. 2005) ("Section 378-2(3) expressly allows claims against individuals who are not employers if the individuals 'aid, incite, compel, or coerce' discrimination."); *White v. Pac. Media Group, Inc.*, 322 F. Supp. 2d 1101, 1114 (D. Haw. 2004) (Ezra, J.) ("Only in Section 378-2(3) did the legislature include the broad reference to 'any person whether an employer, employee, or not' as being liable for the specific action of aiding, abetting, inciting, compelling, or coercing discriminatory actions.").

*Tsuru v. Bayer*, 25 Haw. 693, 696 (Haw. 1920)).  Defendants' principal contention is that the property and conduct at issue here—unauthorized use of a credit card to make purchases—cannot be the subject of the tort of conversion.  *See* Dkt. No. 20 at 6–8; Dkt. No. 26 at 5. The Court disagrees.

It does not appear the Hawaii Supreme Court has decided the issue, nor has either party directed the Court to any binding authority addressing whether Hawaii law recognizes a conversion claim based upon unauthorized credit card purchases.[3] The Court must therefore "predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance."  *PSM Holding Corp. v. Nat'l Farm Fin. Corp.*, 884 F.3d 812, 820 (9th Cir. 2018) (internal quotation marks omitted)). For guidance, the Hawaii Supreme Court has frequently turned to the Restatement (Second) of Torts.[4]

According to the Restatement, conversion may be based upon (1) "conversion of a document in which intangible rights are merged" and "the damages include the value of such rights"; or (2) conduct that "effectively prevents the exercise of intangible rights of the kind customarily merged in a document . . ., even though the

---

[3]*See* Dkt. No. 20 at 5–8; Dkt. No. 26 at 5; Dkt. No. 22 at 8–11.
[4]*See Hac v. Univ. of Hawai'i*, 73 P.3d 46, 60 (Haw. 2003) (intentional infliction of emotional distress); *Maguire v. Hilton Hotels Corp.*, 899 P.2d 393, 396 (Haw. 1995) (special relationships); *Chun v. Park*, 462 P.2d 905, 909 (Haw. 1969) (negligent misrepresentation).

document is not itself converted."  Restatement (Second) of Torts § 242(1)–(2) (1965).  Under these principles, the "prevailing view" is that "there can be no conversion of an ordinary debt not represented by a document, or of such intangible rights as the goodwill of a business or the names of customers."  *Id.* § 242 cmt. f. By contrast, conversion may lie where the subject property was "promissory notes, bonds, bills of exchange, share certificates, and warehouse receipts, *whether negotiable or non-negotiable*," "insurance policies," and "savings bank books," as well as instances "where the converted document is not in itself a symbol of the rights in question, but is merely essential to their protection and enforcement, as in the case of account books and receipts."  *Id.* § 242 cmt. b (emphasis added).[5]

With respect to intangible property, the Restatement is in accord with federal case law in this jurisdiction.  Federal courts have predicted that the Hawaii Supreme Court would not recognize a conversion claim based on the unauthorized "taking of a broadcast signal," *J & J Sports Prods., Inc. v. Alcantara*, No. CIV. 13-00220 LEK, 2014 WL 1669070, at *4 (D. Haw. Apr. 25, 2014), or for "unpaid wages and refusal to reimburse expenses," *Pelayo v. Platinum Limousine Servs., Inc.*, No. 15-00023 DKW-BMK, 2015 WL 5768949, at *7, *9 (D. Haw. Sept. 30, 2015); In re *Wal-Mart*

---

[5]The Restatement further notes that the documents listed "do not constitute an all-inclusive catalogue . . . The law is evidently undergoing a process of expansion, the ultimate limits of which cannot as yet be determined," and "nothing [in the Restatement] is intended to indicate that in a proper case liability for intentional interference with some other kind of intangible rights may not be found."  Rest. 2d Torts § 242 cmt. b, f.

*Wage & Hour Emp. Pracs. Litig.*, 490 F. Supp. 2d 1091, 1109 (D. Nev. 2007) (forecasting that "Hawai'i would not recognize a conversion claim based on unpaid wages" or where "a defendant alters its own electronic payroll records to avoid paying the plaintiff's wages").

On the other hand, when the case involved other forms of intangible property, courts in this jurisdiction have not hesitated to find that a plaintiff stated a claim for conversion.  For example, a plaintiff had a triable conversion claim where the defendants had stolen trust funds by drafting and endorsing a check without authorization.  *Yoneji v. Yoneji*, 354 P.3d 1160, 1163, 1165–66 (Haw. Ct. App. 2015).  A conversion claim also survived summary judgment where it was alleged the defendant withheld a bill of lading for a yacht plaintiff owned (and could still use) until plaintiff paid for other services rendered.  *See Matsuda v. Wada*, 101 F.Supp.2d 1315, 1322 (D. Haw. 1999).  And where the plaintiff alleged the defendant had, contrary to the parties' contract, wrongfully retained deposits, assumed ownership of the funds, and "refus[ed] to return the deposits after demand was made," this Court held the allegations "sufficiently state a claim for conversion of specific, identifiable funds."  *Sunday's Child, LLC v. Irongate AZREP BW LLC*, No. CV 13-00502 DKW-RLP, 2017 WL 561338, at *5 (D. Haw. Feb. 10, 2017).  Similarly, at the pleading stage, the alleged "unauthorized use of a company credit card is wrongful and inconsistent with [p]laintiffs' property rights and thus

sufficiently states a claim for conversion." *JN Grp. Holdings, Inc. v. Ryan*, No. CV 17-00375 ACK-KJM, 2018 WL 485937, at *9 (D. Haw. Jan. 19, 2018) (holding that plaintiff also stated a claim for conversion based on the unauthorized use of plaintiff's rental cars and retaining "spiffs and bonuses"). *JN Grp. Holdings* is both on point with the allegations here and not an outlier. In cases involving conversion based upon unauthorized credit card transactions, courts have consistently followed *Welco Electronics, Inc. v. Mora*, 166 Cal. Rptr. 3d 877 (Cal. Ct. App. 2014), which is perhaps the seminal case on the issue.

In *Welco Electronics*, the court surveyed treatises, scholarly publications, and case law before holding that a company had a cognizable claim for conversion against its employee for unauthorized transactions made with a company credit card. *See* 166 Cal. Rptr. 3d at 879–80, 884–88.[6] The court reasoned that "the intangible property converted was plaintiff's credit card or its number and a portion of plaintiff's credit card account." *Id.* at 888. "Plaintiff had a property right in its credit card account because plaintiff's interest was specific, plaintiff had control over its credit card account, and plaintiff had an exclusive claim to the balance in the account." *Id.* at 884. When defendant "misappropriated plaintiff's credit card and

---

[6]The elements of a conversion claim under California law are substantially the same as that under Hawaii law. *Welco Electronics*, 166 Cal. Rptr. 3d at 881 (stating a plaintiff must prove: "(1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." (citation omitted)).

used it, part of plaintiff's credit balance with the credit card company was taken by defendant, and what resulted was an 'unauthorized transfer' to defendant of plaintiff's property rights—*i.e.*, money from the available credit line belonging to plaintiff with the credit card company." *Id.* In other words, plaintiff could pursue recovery under a conversion theory because "[d]efendant . . . had to take plaintiff's credit card or its information in order to obtain the money from the credit card company, resulting in charges showing up on the statement for which plaintiff was responsible to pay." *Id.* at 886. The court noted that "the tort of conversion has been adapted to new property rights and modern commercial transactions," and the fact that the taking "affected plaintiff's rights with a third party" (the credit card company) "does not mean that there has not been a conversion of intangible property." *Id.* at 884; *see Freddy Nobriga Enters.*, 295 P.3d at 1000 ("So long as [a defendant] intends to deal with the property in a way which is in fact inconsistent with the plaintiff's right, [the defendant] is a converter." (citation omitted)).

The analysis in *Welco Electronics* is sound and squares with decisions applying Hawaii law. The exclusive right to use a credit card to make purchases is akin to the intangible property interest in a check and the associated account funds. *Yoneji*, 354 P.3d at 1165–66. Unlike an employer merely withholding "unpaid wages" that simply "constitute evidence of money owed" for services rendered, *Pelayo*, 2015 WL 5768949, at *7–9 (quoting In re *Wal-Mart Wage & Hour Emp.*

*Pracs. Litig.*, 490 F. Supp. 2d at 1109), a defendant who uses a credit card without consent is *taking* the card itself (or the account information), identifiable funds, and available credit, none of which the defendant ever has any legal right (in any degree) to use or possess.   Moreover, similar to other written instruments "in which intangible rights are merged," Rest. 2d Torts § 242, a consumer's exclusive right to use a credit card to draw on a line of credit is evidenced by the credit card itself and a contract between the credit card company and the consumer.   Thus, "[t]aking a credit card or its information in order to obtain money is not materially different in effect from conversions by taking other instruments such as checks, bonds, notes, bills of exchange, warehouse receipts, stock certificates, and information related to those instruments, to obtain someone else's money."   *Welco Electronics*, 166 Cal. Rptr. 3d at 886; *see Yoneji*, 354 P.3d at 1165–66; Rest. 2d Torts § 242 cmt. b, f.   The Hawaii Supreme Court would likely reach the same conclusion.

As a result, Jass' conversion claim is cognizable.   Jass alleges that, without his consent, Defendants: "intentionally took and maintained control of [Jass'] credit card information"; used his "credit card information to make charges for items, goods, and/or services that have strictly benefited Defendants"; and "continued to use the credit cards," despite Jass having "expressly told Defendants to cease . . . and to repay [him] for the unauthorized charges and late fees, which they refused to do." Dkt. No. 17, ¶¶ 136–38; *see id.* at ¶¶ 68, 86, 87, 130.   Applying the rationale in *Welco*

*Electronics*, Jass has sufficiently stated a claim for conversion of a specific, identifiable property interest.[7]  Accordingly, Count IX remains viable.

## III.   Unjust Enrichment (Against All Defendants) – Count VIII

Jass' unjust enrichment claim (Count VIII) and conversion claim are largely based on the same facts.  "[A] claim for unjust enrichment requires only that a plaintiff prove [1] that he or she 'conferred a benefit upon' the opposing party and [2] that the 'retention of that benefit would be unjust.'"  *Durette v. Aloha Plastic Recycling, Inc.*, 100 P.3d 60, 74 (Haw. 2004) (citation and brackets omitted).  A "necessary prerequisite," however, is "the absence of an adequate remedy at law." *Porter v. Hu*, 169 P.3d 994, 1007 (Haw. Ct. App. 2007) (citation omitted). Defendants argue Jass has an adequate remedy at law under Section 6 of the Agreement, Dkt. No. 20 at 9, which provides that Jass will be reimbursed for "reasonable and necessary out-of-pocket expenses" he may incur in "furthering [SMC]'s business, including expenses for entertainment, travel, and similar items." Dkt. No. 5-2 at 4.  The Court is not persuaded.

Section 6 of the Agreement speaks to part of Jass' claim for expenses that *he* incurred.   Dkt. No. 17, ¶ 68 ("Defendants also intentionally reversed out past

---

[7]To the extent Defendants argue Jass has not "specif[ied] an amount or identif[ied] unauthorized purchases," Dkt. No. 20 at 8, a conversion claim does not trigger the particularity requirements of pleading under Fed.R.Civ.P 9(b).  Indeed, as Defendants note, Dkt. No. 20 at 7, a plaintiff is only "required to allege a sum that is '*capable* of identification.'"  *JN Grp. Holdings*, 2018 WL 485937, at *9 (emphasis added) (quoting *Natomas Gardens Inv. Grp., LLC v. Sinadinos*, 710 F. Supp. 2d 1008, 1023 (E.D. Cal. 2010)).  Jass has adequately done so here.

reimbursement payments on Plaintiff's credit cards they used for [CherryRoad] business, claiming the reimbursement payments themselves were unauthorized"). But the lion's share of Jass' claim for unjust enrichment concerns debt he incurred by virtue of *Defendants* allegedly having made unauthorized transactions with Jass' credit card.  Dkt. No. 17, ¶¶ 136–38; *see id.* at ¶¶ 68, 86, 87, 130.  Because Section 6 of the Agreement "does not fully address [the] injustice" alleged, Jass may seek to recover in equity under a theory of unjust enrichment.  *Porter*, 169 P.3d at 1007; *see also Haw. Ventures, LLC v. Otaka, Inc.*, 164 P.3d 696, 741–42 (Haw. 2007) (noting that a court may "prevent the unjust enrichment of the defendant, where the plaintiff's property has been used in discharging an obligation owed by the defendant."); *Durette*, 100 P.3d at 27 ("One who receives a benefit is of course enriched, and he would be unjustly enriched if its retention would be unjust." (citation omitted)).

To the extent Defendants contend Jass must elect to proceed on only one theory, Rule 8's pleading standards state otherwise.  Rule 8(d)(2) provides that "[a] party may set out 2 or more statements of a claim . . . alternatively or hypothetically, either in a single count . . . or in separate ones.  If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."  Fed.R.Civ.P 8(d)(2).  The Court simply cannot determine at present whether "plausible" equitable remedies that might be available are duplicative of, or broader than, the damages

available for breach of the Agreement.  Of course, Jass cannot obtain a "double recovery" for the same harm under alternative theories.  *E.g.*, *Porter*, 169 P.3d at 1008; *Teutscher v. Woodson*, 835 F.3d 936, 954 (9th Cir. 2016).  But at the pleading stage of the litigation, it is not certain that Jass' claim for breach of the Agreement under Count I will provide Jass with an adequate remedy at law for the alleged credit card charges Defendants caused him to wrongfully incur.

Accordingly, Jass may proceed with his unjust enrichment claim (Count VIII) as an alternative theory of recovery.

## IV. Conspiracy (Against Gulban and Visco) – Count III

In Count III, Jass asserts a claim for civil conspiracy against Defendants Gulban and Visco.  Dkt. No. 17, ¶¶ 85–94.  Defendants incorrectly argue that Jass has failed to allege an underlying tort to support his conspiracy claim. Dkt. No. 20 at 13–14; Dkt. No. 26 at 8–9.

A civil conspiracy "is a combination of two or more persons [or entities] by concerted action to accomplish a criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means." *Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe Transp. Co.*, 982 P.2d 853, 881 n.28 (Haw. 1999) (quoting *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 466 (1921)), *superseded by statute on other grounds as stated in Davis v. Four Seasons Hotel Ltd.*, 228 P.3d 303, 308 n.9 (Haw. 2010).  "Civil conspiracy does not alone

constitute a claim for relief." *Robert's*, 982 P.2d at 889 n.44. "A plaintiff must allege an actionable underlying claim upon which to base a claim of conspiracy." *Mock v. Castro*, 98 P.3d 245, 2004 WL 1977617, at *8 (Haw. 2004) (citing *Ellis v. Crockett*, 451 P.2d 814, 823 (Haw. 1969)). Moreover, since 1970, it has been "widely accepted that a plaintiff could bring suit for civil conspiracy only if he had been injured by an act that was itself tortious." *Lee Ching v. Loo Dung*, 446 P.3d 1016, 1040 (Haw. Ct. App. 2019) (quoting *Beck v. Prupis*, 529 U.S. 494, 501–03 (2000)), *cert. granted*, No. 07-1-1116-06, 2019 WL 6525163 (Haw. Dec. 4, 2019); Restatement (Second) of Torts § 876, cmt. b (1977); *see also Farmer ex rel. Keomalu v. Hickam Fed. Credit Union*, 224 P.3d 455, 2010 WL 466007, at *16 (Ct. App. 2010) ("For a civil conspiracy claim to be valid, an underlying tort must be shown.").

Here, although it is unclear whether Jass' claim under Haw. Rev. Stat. Section 378-2(a)(3) sounds in tort, as he contends, Dkt. No. 22 at 17–20, the Court reserves ruling on that issue, if needed, for another day because Jass' conversion claim against Gulban and Visco clearly supplies the underlying tort for Jass' conspiracy claim. *See* Dkt. No. 17, ¶ 87 ("Defendants had an implicit or explicit agreement to cover up with specific intent their own misconduct and to continue to incur charges on Plaintiff's credit cards, even though Plaintiff demanded they stop the charges and to repay him back for the charges and the fees they incurred."). As such, Count III is not a standalone conspiracy claim. *Robert's*, 982 P.2d at 889 n.44.

Because Jass has alleged that Gulban and Visco conspired to commit an underlying tort—conversion based upon unauthorized credit card purchases—Jass' conspiracy claim (Count III) may proceed.

## V.    ERISA Claim Against CherryRoad – Count VII

Jass asserts that by virtue of CherryRoad failing to provide him with notice upon his termination that he was eligible to elect continued health insurance coverage, CherryRoad violated the notice requirements under 29 U.S.C. Section 1166 of ERISA, as amended by the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA),[8] which resulted in the cancellation of Jass' insurance coverage and out-of-pocket expenses.  Dkt. No. 17, ¶¶ 120–21, 127.  CherryRoad argues it is not the proper ERISA defendant because it is not the "plan administrator," and that the FAC fails to allege that Jass was not provided the required notices or that he was qualified for COBRA coverage following his termination.  Dkt. No. 20 at 12–13; Dkt. No. 26 at 7–8.  Although Jass has alleged a violation of the notice requirements, Jass' ERISA claim fails because nothing in the complaint indicates CherryRoad is the "plan administrator."

COBRA amended ERISA, among other statutes, to "require an employer who sponsors a group health plan to give the plan's 'qualified beneficiaries' the opportunity to elect 'continuation coverage' under the plan when the beneficiaries

---

[8]*See* Pub. L. No. 99-272, 100 Stat. 82, 222–37 (codified as amended at 29 U.S.C. § 1161 *et seq.*).

might otherwise lose coverage upon the occurrence of certain 'qualifying events,' including . . . the termination of the covered employee's employment (except in cases of gross misconduct) . . ."  *Geissal v. Moore Med. Corp.*, 524 U.S. 74, 80 (1998) (quoting 29 U.S.C. § 1163 (listing qualifying events)); *see also* 29 U.S.C. § 1161(a).  The statute, in particular, provides that within 30 days of employment termination, "the employer of an employee under a plan must notify **the administrator** of [the employment termination] . . ."  *See* 29 U.S.C. § 1166(a)(2) (emphasis added).  Then, "within 14 days . . . of the date on which the administrator is notified," *id.* § 1166(c), "the administrator shall notify . . . [the] qualified beneficiary" of his or her right under COBRA to elect continuation health care coverage.  *See id.* § 1166(a)(4)(A); *see also Geissal*, 524 U.S. at 80.

ERISA's civil enforcement provision grants a plan "participant or beneficiary" a cause of action to sue "**[a]ny administrator**" who fails to comply with "the [notice] requirements" in Section 1166(a)(4).  29 U.S.C. § 1132(a)(1)(A), (c)(1) (emphasis added).  In such cases, a court may, "in [it]s discretion," impose a penalty of up to $110 for each day the notice violation has continued or grant any "other relief as it deems proper."  *Id.*; 29 C.F.R. § 2575.502c-1.

The statutes are clear: "Penalties under 29 U.S.C. § 1132(c)(1) can only be assessed against 'plan administrators' for failing to produce documents that they are required to produce as plan administrators."  *See, e.g.*, *Lee v. ING Groep, N.V.*, 829

F.3d 1158, 1162 (9th Cir. 2016); *Sgro v. Danone Waters of N. Am., Inc.*, 532 F.3d 940, 945 (9th Cir. 2008) ("That section only gives [plaintiff] a remedy against the plan 'administrator'"); *Cline v. Industrial Maintenance Eng'g & Contr. Co.*, 200 F.3d 1223, 1234 (9th Cir. 2000) ("Under 29 U.S.C. § 1132(c), only the plan 'administrator' can be held liable for failing to comply with the reporting and disclosure requirements."); *Moran v. Aetna Life Ins. Co.*, 872 F.2d 296, 299–300 (9th Cir. 1989) (refusing to "rewrite the statute to extend liability" based upon an equitable estoppel theory to allow recovery against an entity that was not the plan administrator). "Plan administrators" and "employers" are separate entities with separate definitions under ERISA. *See* 29 U.S.C. § 1002(16)(A), (5). Section 1002(16) provides:

> (A) The term "administrator" means—
>
>> (i) the person specifically so designated by the terms of the instrument under which the plan is operated;
>>
>> (ii) if an administrator is not so designated, the plan sponsor; or
>>
>> (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe.
>
> (B) The term "plan sponsor" means (i) the employer in the case of an employee benefit plan established or maintained by a single employer, (ii) the employee organization in the case of a plan established or maintained by an employee organization, or (iii) in the case of a plan established or maintained by two or more employers or jointly by one or more employers and one or more employee organizations, the association, committee, joint board of trustees, or other similar group of representatives of the parties who establish or maintain the plan.

29 U.S.C. § 1002(16)(A). Here, Jass has not offered even a conclusory allegation that CherryRoad was designated as the "plan administrator" for the policy under which Jass was allegedly covered. Nor has Jass asserted CherryRoad was the "plan sponsor," much less asserted any factual allegations that might give rise to such an inference.

In sum, Congress only authorized suit against plan administrators under 29 U.S.C. Section 1132(c)(1). Because the FAC does not plausibly allege that CherryRoad is the plan administrator, Jass' ERISA claim under Count VII is dismissed, albeit with leave to amend.

## CONCLUSION

For the reasons set forth herein, Defendants' Motion to Dismiss, Dkt. No. 20, is GRANTED IN PART AND DENIED IN PART. Plaintiff may have until **August 3, 2020** to file an amended complaint, to the limited extent allowed herein.

IT IS SO ORDERED.

DATED: July 13, 2020 at Honolulu, Hawaiʻi.



Derrick K. Watson
United States District Judge

_Haralds Jass v. CherryRoad Technologies, Inc., et al._; Civil No. 19-00609-DKW-RT; **ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; AND (2) GRANTING PLAINTIFF LEAVE TO AMEND THE COMPLAINT.**