IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| HARALDS JASS, | Case No. 19-cv-00609-DKW-RT |
| | Case No. 20-cv-00066-DKW-RT |
| Plaintiff, | |
| | **ORDER (1) GRANTING IN PART** |
| v. | **AND DENYING IN PART** |
| | **DEFENDANTS' MOTION FOR** |
| CHERRYROAD TECHNOLOGIES INC., | **SUMMARY JUDGMENT, (2)** |
| *ET AL.*, | **DENYING PLAINTIFF** |
| | **HARALDS JASS' MOTION FOR** |
| Defendants. | **SUMMARY JUDGMENT ON** |
| | **COUNTS I AND VII, (3)** |
| | **GRANTING IN PART AND** |
| | **DENYING IN PART JASS'** |
| HO YIN JASON WONG, | **MOTION TO DISMISS OR, IN** |
| | **THE ALTERNATIVE, FOR** |
| Plaintiff, | **SUMMARY JUDGMENT ON** |
| | **ALL COUNTERCLAIMS, AND** |
| v. | **(4) GRANTING IN PART AND** |
| | **DENYING IN PART PLAINTIFF** |
| CHERRYROAD TECHNOLOGIES, INC., | **HO YIN JASON WONG'S** |
| *ET AL.*, | **MOTION TO DISMISS OR, IN** |
| | **THE ALTERNATIVE, FOR** |
| Defendants. | **SUMMARY JUDGMENT ON** |
| | **ALL COUNTERCLAIMS** |

## **INTRODUCTION**

Pending before the Court are four motions for summary judgment filed by the

parties, three by Plaintiffs Haralds Jass (Jass) and Ho Yin Jason Wong (Wong, and,

together with Jass, Plaintiffs) and one by Defendants CherryRoad Technologies Inc.

(CR), Jeremy Gulban (Gulban), and Nicholas Visco (Visco, and, collectively with CR and Gulban, Defendants), seeking relief with respect to the claims and counterclaims raised in this action.

Having reviewed the many briefs and voluminous evidence filed in connection with the four motions, the Court finds that, while summary judgment is warranted on a few of the claims and counterclaims, most of the evidence at this juncture is either disputed or lacking, precluding judgment for any party. Therefore, for the reasons set forth below, Defendants' motion for summary judgment and Plaintiffs' motions with respect to the counterclaims are GRANTED IN PART and DENIED IN PART, while Jass' motion for summary judgment on Claims 1 and 7 of his Second Amended Complaint is DENIED.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party is entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of a claim in the case on which the non-moving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In contrast, when the moving party bears the burden of

proof, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted…." *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992). This means that the movant "must establish beyond controversy every essential element" of its claims. *See S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (quotation omitted). In assessing a motion for summary judgment, all facts are construed in the light most favorable to the non-moving party. *Genzler v. Longanbach*, 410 F.3d 630, 636 (9th Cir. 2005).

## UNDISPUTED MATERIAL FACTS

The facts set forth below are those that are undisputed (and/or not properly disputed), material, and established by the factual statements and evidence submitted by the parties in support of, and in opposition to, the four motions for summary judgment.[1]

---

[1]As an initial matter, the Court notes that, in their various concise statements of facts, the parties commit numerous direct and indirect violations of Local Rule 56.1. For example, in violation of Local Rule 56.1(b), both parties repeatedly make *multiple* factual assertions in one statement of fact. *See, e.g.*, Dkt. No. 93-1 at ¶¶ 3, 5, 7-9, 11-15, 17, 19-20, 23-25; Dkt. No. 95-1 at ¶¶ 1-2, 5, 7, 10. For instance, of the 25 numbered statements in Jass' concise statement of facts in support of his motion for summary judgment on Claims 1 and 7 (Dkt. No. 93-1), more than half of them violate the local rule. Put simply, each numbered statement is not meant to contain multiple facts grouped under one purported *category*, as Plaintiffs appear to believe. Defendants do so as well, although perhaps less directly. Rather than including multiple sentences under one numbered statement, Defendants elongate single sentences such that they become a paragraph containing multiple facts. *See, e.g.*, Dkt. No. 92-2 at ¶¶ 25, 30, 38, 43. Using semi-colons is not the ticket to violating the local rule. Both parties also fail to provide pinpoint cites to documents containing multiple pages, again violating Local Rule 56.1(b). *See, e.g.*, *id*. at ¶ 8 (citing, *inter alia*, Dkt. No. 92-32); Dkt. No. 109-1 at ¶¶ 8, 11 (citing, *inter alia*, Dkt. No. 106-

Since at least early 2009, Jass owned and operated Superb Management Corporation (SMC), Superb Development & Service Corporation (SDSC), Superb Internet Corporation (SIC), and HopOne Internet Corporation (HopOne). Defendants' Concise Statement in Support of Motion for Summary Judgment at ¶ 1, Dkt. No. 92-2.[2]  Wong was Jass' second-in-command.  *Id.*  In part because Jass' companies experienced declining revenues, he began looking for potential buyers.  *Id.* at ¶ 2.  Around June 2018, Jass started negotiating a potential acquisition of his companies with CR.  *Id.*  During these negotiations, Jass informed CR that his spouse, Wong, would need to remain employed with SMC as part of any deal.  *Id.* at ¶ 3.

In 2006, CR was incorporated in Florida.  9/8/21 Decl. of Jeremy Gulban at ¶ 4, Dkt. No. 102-4.  Prior to January 2021, CR was owned by the Michael J. Gulban and Ann Marie Gulban Family Trust, the Michael Gulban Revocable Trust, and the Ann Marie Gulban Revocable Trust.  *Id.* at ¶ 6.  Many of CR's directors and officers have been located in New Jersey, Florida, and other states, but not in

---

10); Dkt. No. 93-1 at ¶¶ 7; Dkt. Nos. 94-1 & 95-1 at ¶¶ 2 (citing, *inter alia*, Dkt. Nos. 94-12 & 95-12), 7 (citing, *inter alia*, Dkt. No. 94-4 & 95-6).

[2]Because these cases are consolidated and, identical motions for summary judgment have been filed in each case, for brevity purposes, unless otherwise stated, the Court cites only to docket entries in the former of the two cases: *Jass v. CherryRoad Technologies Inc. et al.*, Case No. 19-cv-609-DKW-RT.

Hawai'i.   *Id*. at ¶ 7.   At some point, CR's board of directors consisted of Michael Gulban, Ann Marie Gulban, Amy Ramsburg, Thomas Ferrando, and Robert Guyett.   *Id*. at ¶ 8; 2/14/20 Annual Report to the State of Florida at 1-2, Dkt. No. 106-9.   CR's officers included Gulban, Amy Ramsburg, Lisa Cornachia, and Stephen Lange.   9/8/21 Gulban Decl. at ¶ 9.[3]

On and around May 1, 2019, various acquisition-related agreements were signed by the parties.   In no particular order, first, CR and Superb Internet Technologies Inc. (SIT) entered into a Share and Asset Purchase Agreement (SAPA) with Jass and SIC, whereby CR bought HopOne, SIT bought substantially all of SIC's assets, CR became the minority owner of SMC, and Jass would receive payments based on the revenue of the acquired companies.   Dkt. No. 92-2 at ¶ 4.

CR and Jass also entered into a Shareholders Agreement, whereby Jass would control one board seat of SMC, while CR would control two.   *Id*. at ¶ 6. Jass appointed himself to his board seat, and CR appointed Gulban and Visco.   *Id*. Under the Shareholders Agreement, CR could unilaterally remove and designate a

---

[3]The Court notes that the Annual Report (Dkt. No. 106-9) and Gulban Declaration (Dkt. No. 106-4 at ¶¶ 8-9) cited by Defendants are not entirely consistent on the names of the directors and officers for CR.   For example, the Annual Report lists Bruce Ramsburg as an officer, while the Gulban Declaration does not.   Therefore, here, the Court only includes those officers and directors as to which the evidence is consistent.   The Court also notes that *when* these officers and directors held (or still hold) their positions is unclear.   The Annual Report was filed on February 14, 2020.   As for Gulban's Declaration, he uses the present tense when providing the identity of the officers and directors.   *See* 9/8/21 Gulban Decl. at ¶¶ 8-9.

replacement for either of the two directors it had appointed to the board. Shareholders Agreement at ¶ 1(b), Dkt. No. 93-5.   Pursuant to the Shareholders Agreement, Jass could not, on behalf of SMC, adopt a budget or business plan, incur indebtedness greater than $1,000 in a single transaction, make loans, or advance funds without the approval of SMC's board or, if a shareholder vote was required, CR.   *Id*. at ¶ 2(a).

After May 1, 2019, Jass held approximately 92% of the stock shares of SMC, and CR owned approximately 8% of the same.   Plaintiffs' Joint Concise Statement of Facts in Opposition to Defendants' Motion for Summary Judgment at ¶ 3, Dkt. No. 107.

Jass and Wong also each entered into an employment agreement (EA) with SMC.   Dkt. Nos. 94-3, 94-9.   Pursuant to Jass' EA, he was hired, on a full-time basis, as President of SMC for a period of three years unless terminated earlier pursuant to the EA.   Dkt. No. 94-3 at ¶¶ 1-2.   Jass' EA also made him eligible for a bonus.   Any bonus, though, had to be approved by a two-thirds vote of SMC's board of directors and was based upon CR's 2019 bonus plan.   *Id*. at ¶ 4(a). Further, Jass' vacation time was subject to the approval of SMC's board.   *Id*. at ¶ 5.   At some point after June 11, 2019, Jass learned that Charles Deskins

6

(Deskins), an employee of CR, would supervise his work.   9/8/21 Decl. of Haralds

Jass at ¶21, Dkt. No. 107-1.

Wong's EA, by contrast, specified that he was hired, on a part-time basis, as

Director of Governance & Information Systems for a period of three years unless

terminated earlier pursuant to the EA.   Dkt. No. 94-9 at ¶¶ 1-2.   Wong's base

salary was $4,600 per month.   *Id*. at ¶ 4.   Wong was responsible for human

resources (HR) functions and government relations, among other duties.   8/10/21

Decl. of Ho Yin Jason Wong at ¶ 3, Dkt. No. 94-8.   As of July 22, 2019, Gulban

expected Wong to report to Deskins.   7/22/19 Email from Gulban to Jass, Dkt. No.

93-10.

In their respective EAs, Jass and Wong could be terminated for "Cause" as

defined therein.   Dkt. No. 94-3 at ¶ 10(b); Dkt. No. 94-9 at ¶ 10(b).   The EAs

described five categories of conduct representing "Cause," but, "[i]n all cases, for

Cause to exist, [SMC] must give Employee written notice specifying in reasonable

detail the act(s) or omission(s) that [SMC] believes constitute Cause and, in the

case of items (A), (D), and (E) in this Section [10](e)(i), a reasonable opportunity

for Employee to correct such act(s) or omission(s)."   Dkt. No. 94-3 at 10(e)(i);

Dkt. No. 94-9 at 10(e)(i).[4]   An Employee Handbook authored by Wong applied to SMC during the time of Jass and Wong's employment there.   7/20/21 Depo. of Haralds Jass at 113:9-17, Dkt. No. 92-20; 7/21/21 Depo. of Ho Yin Jason Wong at 174:25-175:10, Dkt. No. 97-1.

Pursuant to Non-Disclosure Agreements attached to their EAs, upon termination, Jass and Wong were required to "delete or erase all intangible Confidential Information of [SMC] in [their] possession."   Exh. B to Dkt. No. 94-3 at ¶ 4, Dkt. No. 94-3 at 9-10; Exh. B to Dkt. No. 94-9 at ¶ 4, Dkt. No. 94-9 at 8-9.

Next, CR, SMC, and SDSC entered into an Intercompany Services Agreement (ISA), whereby CR engaged SMC and SDSC to provide management, administrative, and software-related services to CR, while CR agreed to pay certain invoices and payroll expenses incurred by SMC and SDSC.   Dkt. No. 106-10 at ¶¶ 1-2.   In addition, SIC and SIT entered into a Transition Services Agreement, whereby SIC would perform certain payment collecting and processing services for SIT.   Dkt. No. 92-2 at ¶ 5.

---

[4]In the EAs, the definition of "Cause" is largely, although not entirely, the same.   The only differences between the EAs is, in Jass' EA, categories (D) and (E) include reference to SMC's directors.   *Compare* Dkt. No. 94-3 at ¶ 10(e)(i), *with* Dkt. No. 94-9 at ¶ 10(e)(i).

On May 5, 2019, Jass suggested to Gulban that Wong be considered for a full-time role.   5/5/19 Email from Jass to Gulban, Dkt. No. 92-33 at 1-2.   Jass also informed Gulban that he and Wong would be travelling to New Jersey in June 2019 to visit CR.   *Id*. at 1.   On June 11-12, 2019, Jass and Wong visited CR's headquarters.   Dkt. No. 92-2 at ¶ 10.   At a dinner during this visit, CR employees told Wong they were interested in getting to know him better and asked about his hobbies, interests, and educational background.   Wong Depo. at 291:8-17. During this time period, Jass and Wong began looking for housing in New Jersey. 6/20/19 Email from Jass to Gulban, Dkt. No. 92-36 at 1; Jass Depo. at 191:11-192:16.

After returning to Honolulu, Wong was informed that CR had imposed a limit on his spending authority.   9/8/21 Wong Decl. at ¶ 13.   Wong previously had no limit on his spending authority.   *Id*.   The limitations imposed would not permit Wong to perform audit functions at offices on the mainland.   *Id*.   On June 20, 2019, CR extended to SMC a policy for spending and contracting authorization levels.   Dkt. No. 93-13 at 1.   The spending policy described SMC as a "subsidiary" of CR.   *Id*.

On June 21, 2019, SMC sent Jass an offer for Wong to work full-time between June 15, 2019 to December 31, 2019.   Employment Agreement

9

Addendum at ¶ 1, Dkt. No. 92-37; 6/21/19 Email from Visco to Jass, Dkt. No. 92-37.   This would have resulted in Wong's pay increasing from $4,600 per month to $8,250 per month during the period of his full-time employment or approximately $100,000 on an annualized basis.   Employment Agreement Addendum at ¶ 4. Wong rejected the offer because the pay increase lasted only until December 31, 2019, and he believed that he was entitled to $195,000 to $200,000 per year based upon an internet site's average rate for the position of general counsel.   Wong Depo. at 92:7-18, 95:1-14; Dkt. No. 92-39; 9/8/21 Decl. of Ho Yin Jason Wong at ¶ 14, Dkt. No. 107-10.   Wong was not an attorney, he had not been asked to work in that capacity, and he had never been paid $195,000 to $200,000 by SMC.   Dkt. No. 92-2 at ¶ 16.   After Jass had received SMC's offer for Wong's amended employment, Wong stated that Visco did not want him to work on certain projects and that his part-time status prevented him from doing additional work.   6/21/19 Email from Wong to Bruce Ramsburg, Dkt. No. 92-40 at 1; 6/25/19 Email from Wong to Christopher Tilden, Dkt. No. 92-42.[5]

---

[5]Defendants assert that Wong took these actions "[a]s a result of SMC's and Wong's inability to reach an agreement to amend Wong's employment agreement…."   Dkt. No. 92-2 at ¶ 17. However, from the evidence submitted, in particular, the email correspondence submitted, it is not precisely clear *when* Wong received the offer or *when* the parties were unable to reach an agreement.

On June 24, 2019, Jass recommended that SMC hire Brian Furphy (Furphy) for sales and Chris Henning (Henning) for marketing.   Dkt. No. 92-2 at ¶ 18. Gulban responded that it did not make sense to do so.   *Id.*

On June 27, 2019, Jass asked Gulban whether CR was complying with contract terms with the State of Hawai'i.   9/8/21 Jass Decl. at ¶ 31.   In response, Gulban told Jass that he and Visco would "build a file" against Jass and SIC would be "shut down."   *Id.*[6]

In late June 2019, Jeff Brown (Brown), a manager at HopOne, informed Gulban that Jass had changed customers' credit card expiration dates (and instructed other employees to do the same) without contacting the client, rather than let their payments lapse.   8/16/21 Decl. of Jeremy Gulban at ¶ 19, Dkt. No. 92-4.   Jass had instructed employees to follow this practice in October 2018. 10/10/18 Email from Jass to Enis Kupinic, Dkt. No. 92-47 at 1.   On June 26, 2019, Jass objected to having certain customers moved to different accounts, as he thought doing so would lead to lost revenue.   6/26/19 Email from Jass to Gulban, Dkt. No. 92-49 at 1-2.   Around July 1, 2019, Jass' billing access to the Customer

---

[6]While Defendants dispute this assertion from Jass, Dkt. No. 109-1 at ¶ 16, it is not clear how the evidence they cite "contradict[s]" the same.   Further, while Defendants contend there is "[n]o evidence" for the same, Jass would have personal knowledge of statements made to him, as he contends.   *See* 9/8/21 Jass Decl. at ¶ 31.

Database program, and associated administrative privileges, was revoked.   7/1/19

Email from Raymond Cho to Jass, Dkt. No. 92-51.

On July 15, 2019, HopOne's largest customer, KL Discovery (KL), canceled

its contract with HopOne.   7/15/19 Email from Nicole Kaboli to Jass, Dkt. No. 92-

55.   KL had been a regular customer paying on a monthly basis since at least

2010.   Defendants' Response to Jass' Concise Statement of Facts at ¶ 17, Dkt. No.

106-2.   Prior to KL canceling its contract, Jass had stated that "a lot of additional

business was available" from KL and did not reveal that KL had been canceling

services since March 2019.   8/16/21 Gulban Decl. at ¶ 9.

According to Gulban, because Jass did not provide relevant details about

KL, Gulban ordered a search of Jass and Wong's emails relating to KL.   *Id*. at

¶¶ 27-28.   Gulban discovered that none of Jass and Wong's work emails resided

on company servers.   *Id*. at ¶ 28.   Instead, Jass and Wong had been forwarding

work emails to personal email accounts.   Jass Depo. at 82:22-83:13, 85:17-21;

Wong Depo. at 136:5-24.   In this process, Jass and Wong's emails were not kept

on company servers.   Jass Depo. at 87:3-8; Wong Depo. at 137:4-7.   This process

had been taking place for years before May 1, 2019.   9/8/21 Jass Decl. at ¶ 50;

9/8/21 Wong Decl. at ¶ 38.

12

On multiple occasions, Jass and Wong were instructed to restore work emails to company servers.   Dkt. No. 92-2 at ¶ 26; Plaintiffs' Supplemental Joint Concise Statement of Facts at ¶ 26, Dkt. No. 121; 7/15/19 Email from Visco to Jass & Wong, Dkt. No. 92-57; 9/19/19 Email from Ken Nunes to Christopher Fenstermaker, Wong, *et al*., Dkt. No. 92-74.[7]   Neither Jass nor Wong complied. Jass Depo. at 87:15-17; Wong Depo. at 154:17-19.   Jass and Wong were the only employees not to restore work emails to company servers.   Decl. of Ken Nunes at ¶ 13, Dkt. No. 92-13.[8]

On July 16, 2019, Gulban stated that "work emails are company property" and CR had a right to access works emails because "we own them."   7/16/19 Email from Gulban to Jass & Visco, Dkt. No. 93-12.   In an email on July 19, 2019, Gulban stated that Jass and Wong should be subject to CR's email policies

---

[7]In their supplemental concise statement of facts, Plaintiffs "[p]artially [a]dmit[]" the assertion that they received multiple instructions to return work emails.   Dkt. No. 121 at ¶ 26.   Their dispute appears to be that "Wong did not receive any notice directing him to restore work emails."   *Id*. (quotation omitted).   Plaintiffs, though, have provided no evidence refuting the emails that clearly show Wong was *sent* such instructions on at least two occasions.   Moreover, it cannot be disputed that Wong *received* the email dated September 19, 2019, given that he referenced it in a subsequent email that he sent.   *See* 9/23/19 Email from Wong to Udaya Mainali *et al.*, Dkt. No. 92-76 at 3-5.

[8]The Court notes that, in responding to Defendants' factual assertion that Jass and Wong were the only employees not to return their work emails, Dkt. No. 92-2 at ¶ 29, Jass made a series of irrelevant assertions, such as Defendants' failure to investigate complaints, using Jass' credit cards, and blocking Jass from personal banking information, *see* Dkt. No. 121 at ¶ 29.

because CR "control[led]" and had "operational liability" for SMC.   7/19/19 Email from Gulban, Dkt. No. 93-11 at 1-2.

In mid-July 2019, the parties began discussing whether restructuring the May 1, 2019 agreements would be an option before initiating mediation required by the SAPA.   Defendants' Concise Statement in Support of Motion for Summary Judgment at ¶ 30; Plaintiffs' Supplemental Joint Concise Statement of Facts at ¶ 30.   One of the options discussed was having Jass buy-back assets and have no further affiliation with CR.   Defendants' Concise Statement in Support of Motion for Summary Judgment at ¶ 31.   These discussions were considered confidential. 8/16/21 Gulban Decl. at ¶ 32; Jass Depo. at 160:6-18.[9]   Jass disclosed the discussions, though, to Furphy and Henning.   Defendants' Concise Statement in Support of Motion for Summary Judgment at ¶ 33; Plaintiffs' Supplemental Joint Concise Statement of Facts at ¶ 33; Jass Depo. at 155:10-22, 160:6-18.

On July 31, 2019, Furphy called Gulban and told him that Jass had disclosed the parties' restructuring negotiations to Furphy.   8/16/21 Gulban Decl. at ¶ 34. On the same day, Gulban sent an email to Jass that, *inter alia*, stated Jass'

---

[9]It appears that Plaintiffs dispute the scope of the confidentiality of the discussions, rather than whether the discussions were confidential at all.   More specifically, Jass contends that Gulban gave him authorization to speak with Henning about the discussions, but acknowledges that he shared confidential information about the discussions with Furphy.   *See* Plaintiffs' Supplemental Joint Concise Statement of Facts at ¶¶ 32-33.

disclosure of information to Furphy was "an incurable material breach of your employment agreement and potentially other agreements."   7/31/19 Email from Gulban to Jass, Dkt. No. 92-66.

At some point at the end of July or in August 2019, CR deleted a "superb-e.com" email account that, according to Jass, he used for personal email, among other things.   9/8/21 Jass Decl. at ¶ 41.

On August 21, 2019, SMC held a board meeting.   8/21/19 Minutes of Special Meeting of SMC Board of Directors, Dkt. No. 92-68.   At this meeting, the board—by a vote of two to one, with Gulban and Visco voting in favor and Jass against—terminated Jass' employment with SMC "for cause" effective August 31, 2019.   *Id*. at 1-2.   According to Jass, on the day he was terminated, and one week later, Gulban told him that he had performed his work "diligently" and in the "best interests" of the company.   9/8/21 Jass Decl. at ¶ 44.   Gulban testified that the main reasons for Jass' termination were Jass not recovering emails and giving confidential information to a third-party.   6/25/21 Depo. of Jeremy Gulban at 21:23-22:14, Dkt. No. 107-27.

On September 3, 2019, SMC sent Jass a letter, informing Jass that he would be eligible to elect continued medical coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA).   9/3/19 Letter from Visco to Jass,

Dkt. No. 107-4.   Jass did not receive the COBRA election form until May 2020.

COBRA Continuation Coverage Election Form, Dkt. No. 107-5; 8/10/21 Decl. of

Haralds Jass at ¶ 13, Dkt. No. 93-2.

After Jass' termination, he still had access to certain company bank

accounts.   8/9/21 Decl. of Nicholas Visco at ¶ 8, Dkt. No. 106-5.   At some point

after his termination, Jass initiated unauthorized payments to himself and created

invoices.   *Id*.[10]

On September 17, 2019, Wong, still an employee at SMC, refused to turn

over SMC employee files to CR.   8/13/21 Decl. of Nicholas Visco at ¶ 18, Dkt.

No. 92-5.   On September 18, 2019, Wong filed a Charge of Discrimination with

the Equal Employment Opportunity Commission (EEOC).   Charge of

Discrimination, Dkt. No. 107-16.   Therein, Wong alleged he was retaliated and

discriminated against due to several protected classes.   *Id*.   On September 19,

2019, in an email sent to Visco and Shirley Fee (Fee), CR's Director of Human

Resources, Wong requested that an investigation be conducted into the instances of

---

[10]These statements about Jass' apparent access to SMC bank accounts are made in Defendants'
"Additional Facts" in their Response to Jass' Concise Statement of Facts in support of his motion
for summary judgment on Defendants' counterclaims.   *See* Dkt. No. 106-2 at ¶¶ 11-17.   The
Court notes that, in his reply, Dkt. No. 111, although required to do so by Local Rule, *see* LR
56.1(e), Jass did not respond to any of Defendants' "Additional Facts."   The Court has,
nonetheless, reviewed the evidence submitted in support of Defendants' "Additional Facts."

retaliation and discrimination he believed had occurred.   9/19/19 Email from Wong to Visco, Dkt. No. 107-18 at 1; Decl. of Shirley Fee at ¶ 1, Dkt. No. 92-10.[11] Fee did not initiate any such investigation.   6/23/21 Depo. of Shirley Fee at 30:17-20

Also on September 19, 2019, Wong was instructed, along with other employees, to restore their work emails to company servers.   Nunes Decl. at ¶ 10. Wong did not comply.   *Id.*   Wong also told other employees not to comply. 9/23/19 Email from Wong to Udaya Mainali *et al.*, Dkt. No. 92-75.   On October 24, 2019, Wong was asked to join a team to help get a data center certified, but he refused.   Decl. of Bruce Ramsburg at ¶ 6, Dkt. No. 92-15.   In mid-November 2019, SMC requested historic COBRA information from Wong, but he refused to provide it.   8/16/21 Gulban Decl. at ¶ 43.

In a letter dated December 3, 2019, SMC terminated Wong immediately "for cause."   12/3/19 Letter from Gulban to Wong, Dkt. No. 92-80.   Up to that point, Wong had never been formally disciplined.   9/8/21 Wong Depo. at ¶ 34.

During the period that Jass and Wong were employed by SMC, CR employed approximately 450 employees, none of whom were also employed by

---

[11]Plaintiffs assert that Wong also made a request for an investigation on September 17, 2019. Plaintiffs' Joint Concise Statement of Facts in Opposition to Defendants' Motion for Summary Judgment at ¶ 32.   The evidence to which they cite, however, does not support that assertion.

SMC.   9/8/21 Gulban Decl. at ¶ 11.   SMC employed three individuals: Jass, Wong, and Gregory Krylov.   *Id*. at ¶ 12.   SMC had its own office space in Hawai'i, where all three SMC employees were located.   *Id*.

## PROCEDURAL BACKGROUND

Much of the procedural background of the case brought by Jass is set forth in earlier rulings from the Court in that case.   Dkt. No. 13 at 10-11; Dkt. No. 36 at 8-9.   For purposes of this Order, the Court provides the following further procedural background.

On July 21, 2020, Jass filed a Second Amended Complaint (SAC).   Dkt. No. 37.   Therein, Jass asserted the following claims: (1) breach of contract against CR; (2) violation of Hawai'i Revised Statutes (HRS) Section 378-62 against CR; (3) civil conspiracy against Gulban and Visco; (4) violation of HRS Section 378-2(a)(1)(A) against CR; (5) violation of HRS Section 378-2(a)(2) against CR; (6) violation of HRS Section 378-2(a)(3) against Gulban and Visco; (7) violation of the Employee Retirement Income Security Act of 1974 (ERISA), as amended by COBRA, against CR; (8) unjust enrichment against all Defendants; and (9) conversion against all Defendants.

Wong, meanwhile, filed a Complaint on January 22, 2020.   Case No. 20-cv-66-DKW-RT, Dkt. No. 17 at 8-30.[12]   Therein, Wong asserted the following claims: (1) breach of contract against CR; (2) violation of HRS Section 378-62 against CR; (3) violation of HRS Section 378-2(a)(1)(A) against CR; (4) violation of HRS Section 378-2(a)(2) against CR;[13] and (5) civil conspiracy against Gulban and Visco.

On May 27, 2020, and August 4, 2020, Defendants filed counterclaims against, respectively, Wong and Jass.   Against Wong, Defendants asserted the following counterclaims: (1) conversion; (2) fraudulent concealment; (3) defamation; (4) breach of contract; (5) breach of good faith and fair dealing; (6) unjust enrichment; and (7) civil conspiracy.   Case No. 20-cv-66-DKW-RT, Dkt. No. 18.   Against Jass, Defendants asserted the following counterclaims: (1) conversion; (2) fraudulent concealment; (3) breach of contract; (4) breach of good

---

[12]Wong's Complaint was originally filed in State court and then removed by Defendants to this Court.   Case No. 20-cv-66-DKW-RT, Dkt. No. 1.   In removing, though, Defendants failed to file with their notice of removal the required "copy of all process, pleadings, and orders" served upon them.   *Id*., Dkt. No. 16 at 2 n.1.   Defendants then compounded this failure by filing all of the process, pleadings and orders served upon them−a total of seven items−in one document. *See id*., Dkt. No. 17.   Therefore, when citing to Wong's Complaint, the Court cites to the page numbers created by CM/ECF in the top right-hand corner of the document, *i.e.*, "Page 8 of 56." In addition, going forward, the Court cites to Wong's Complaint as follows: "Compl. at __."
[13]In Wong's Complaint, the heading of the fourth claim states that it, like Claim Three, concerns a violation of HRS Section 378-2(a)(1)(A) against CR.   Compl. at 27.   However, the underlying allegations of the claim itself rely upon HRS Section 378-2(a)(2).   *Id*. at 27 (¶ 113).   Therefore, the Court treats Claim Four as being brought under the latter statutory provision.

faith and fair dealing; (5) unjust enrichment; (6) civil conspiracy; and (7) intentional interference with prospective business advantage.   Dkt. No. 40.

On April 29, 2021, the Court consolidated the action brought by Jass with the action brought by Wong.   Dkt. Nos. 69, 79.   The consolidation was for all purposes, including discovery and trial.   Dkt. No. 79 at 8.

On August 16, 2021, the parties, collectively, filed the four motions for summary judgment pending before the Court.   Dkt. Nos. 92-95.   In the order of filing, first, Defendants seek summary judgment with respect to all claims asserted by Jass and Wong.   Dkt. No. 92.   Second, Jass moves for summary judgment with respect to Claims One and Seven of the SAC.   Dkt. No. 93.   Third, Jass seeks dismissal and/or summary judgment with respect to all counterclaims asserted against him.   Dkt. No. 94.   Finally, Wong seeks dismissal and/or summary judgment with respect to all counterclaims asserted against him.   Dkt. No. 95.

After setting a hearing for September 30, 2021 on the motions for summary judgment, the parties filed their opposition briefs.   Dkt. Nos. 106-108.   They then filed replies in support of each of their motions.   Dkt. Nos. 109-112.

On September 30, 2021, a hearing was held on the four motions for summary judgment.   Dkt. No. 117.   At the conclusion of the hearing, the Court took the motions under advisement.

On October 12, 2021, after further review of the briefing, the Court instructed Plaintiffs to supplement their concise statement of facts in opposition to Defendants' motion for summary judgment.   Dkt. No. 119.[14]   On October 18, 2021, the Court received Plaintiffs' supplemental joint concise statement of facts in opposition to Defendants' motion for summary judgment.   Dkt. No. 121.

This Order now follows.

## DISCUSSION

In the four pending motions for summary judgment, the parties, collectively, seek relief as to all of the claims and counterclaims asserted in these consolidated cases.   The Court begins its review with the arguments made for and against relief with respect to the claims asserted by Plaintiffs, and then turns to the arguments pertaining to Defendants' counterclaims.

## I.   Jass' Second Amended Complaint

1.   Claim One: Breach of Contract

---

[14]The Court did so because it was "unclear" which facts Plaintiffs were admitting and which they were disputing.

In the SAC, Jass alleged that, in various ways, CR had breached the EA between Jass and SMC.   SAC at ¶ 73.   Defendants move for summary judgment, arguing that Jass has failed to establish an essential element of this claim−namely, that he performed under the EA.   Dkt. No. 92-1 at 17-21.   More specifically, Defendants contend that Jass breached his EA by failing to restore work emails to company servers and by divulging confidential information to third parties.   *Id.* at 18-21.   In response, Jass argues that CR breached the EA by not providing him with notice of his acts or omissions prior to his termination.   Dkt. No. 108 at 3-4. Jass further asserts that it was not possible for him to return emails to company servers, CR hired the individual to whom he divulged confidential information, Gulban told Jass that he had performed his work diligently, and CR stated that he would be eligible for COBRA benefits, which he presumes would not have been done had he been terminated for cause.   *Id.* at 4-6.

Jass also moves for summary judgment on this claim.   Dkt. No. 93 at 7-9. He asserts that CR is the "alter ego" of SMC and, thus, can be held liable under his EA.   In addition, he argues that, pursuant to the EA, he could only be terminated for cause if he was given written notice and a reasonable opportunity to correct the alleged acts or omissions.   In response, Defendants assert that there are triable

22

issues of fact as to whether CR was the "alter ego" of SMC, Jass failed to perform under his EA, and CR did not breach the same.   Dkt. No. 102 at 5-9.

In Hawaiʻi, a breach of contract claim requires a plaintiff to establish the following: "(1) the contract at issue; (2) the parties to the contract; (3) whether Plaintiff performed under the contract; (4) the particular provision of the contract allegedly violated by the Defendant[]; and (5) when and how Defendant[] allegedly breached the contract." *Honold v. Deutsche Bank. Nat'l Trust Co.*, 2010 WL 5174383, at *3 (D. Haw. Dec. 15, 2010).

Here, the Court agrees with Defendants that, at least with respect to Jass' confessed divulging of confidential information to a third-party, Jass has failed to establish that he performed under his EA.   Specifically, the EA provides that Jass "shall not, without the prior written consent of [SMC], disclose confidential material, directly or indirectly, to any person or entity, who at the time of such disclosure is not an employee or agent of [SMC]…."   Dkt. No. 93-3 at ¶ 7.   In that regard, Jass has admitted that he disclosed information to Furphy about his discussions with CR about buying back certain assets purchased as part of the parties' May 1, 2019 transactions.   Defendants' Concise Statement in Support of Motion for Summary Judgment at ¶ 33; Plaintiffs' Supplemental Joint Concise Statement of Facts at ¶ 33; Jass Depo. at 155:10-22, 160:6-18.   Jass also admits

that this information was confidential.   Jass Depo. at 160:6-18.   As such, Jass has failed to perform under Section 7 of his EA.

Despite Jass' protestations to the contrary, there is little else to this issue. Jass asserts that CR was required to provide him with notice of any alleged cause for terminating his employment.   At least with respect to divulging confidential information, though, Jass misconstrues his EA and Defendants' argument. Notably, Defendants contend Jass violated Section 7 of the EA.   Section 7 does not contain a requirement that Jass be provided with notice.   Instead, Section 7 is breached when confidential information is disclosed without consent.   And it is undisputed Jass disclosed confidential information without consent to Furphy. Therefore, he did not perform under Section 7.

Jass next asserts that, *after* he divulged confidential information to Furphy, CR hired Furphy.   That may be true, but it has nothing to do with the fact that, *when* the information was divulged, Furphy was "not an employee or agent of [SMC]…."   Dkt. No. 93-3 at ¶ 7.   Jass next asserts that his conduct did not result in injury to CR.   That too may be true, but it is again irrelevant to whether Jass violated Section 7 of his EA−the provision at issue with respect to confidential information.   Notably, that provision does not mention that an employee's conduct must result in some form of injury.   *See id*.   Jass also asserts that he could not

have done anything wrong because Gulban told him that he worked diligently. That assertion is absurd, even if accurate.   Equally absurd, and without any legal support, is Jass' final contention that, because he was eligible for COBRA benefits, he could not have committed gross misconduct.   The issue here is whether Jass divulged confidential information in violation of his EA, something to which he admits, not whether he committed gross misconduct.

Accordingly, CR is entitled to summary judgment with respect to this claim, and Jass is not.

2. Claim Two: Violation of HRS Section 378-62

In the SAC, Jass alleged that, after reporting potential violations of the law and a contract with the State of Hawai'i, CR engaged in retaliatory acts toward him resulting in his termination.   SAC at ¶¶ 78, 80.   Defendants move for summary judgment, arguing that Jass was terminated for reasons other than activity that may be protected by Section 378-62.   Dkt. No. 92-1 at 22-24.   Specifically, Defendants assert that Jass was terminated due to, *inter alia*, his failure to restore work emails and divulging confidential information to third parties.   In response, Jass argues that he engaged in various types of protected activity under Section 378-62: reporting consumer fraud to Gulban, complaining that CR was not complying with its contract with the State of Hawai'i, and reporting violations of

federal law.   Dkt. No. 108 at 9-10.   He further asserts that this activity was met with various adverse employment consequences, such as being threatened, having to report directly to CR employees, being forced to work through a preapproved vacation, blocking him from personal online services, and terminating him.

In Hawaiʻi, a claim under Section 378-62, part of the Hawaiʻi Whistleblowers Protection Act (HWPA), requires a plaintiff to show: (1) he engaged in protected conduct; (2) his employer took adverse action against him; and (3) a causal connection between the adverse action and the protected conduct. *Tagupa v. VIPdesk, Inc.*, 125 F. Supp. 3d 1108, 1119 (D. Haw. 2015).   With respect to a causal connection, an employee bears the initial burden of showing that his protected conduct was a "substantial or motivating factor" for the adverse action.   *Crosby v. State Dep't of Budget & Finance*, 876 P.2d 1300, 1310 (Haw. 1994) (quotation omitted).   An employer may then defend its action(s) "by showing that the termination would have occurred regardless of the protected activity."   *Id*. (quotation omitted).   Ultimately, "[i]n order for an employee to prevail under [Section 378-62], however, the employer's challenged action must have been taken 'because' the employee engaged in protected conduct…."   *Id*. "In other words, [an employer] may avoid liability by showing that the employee's

26

protected speech was not a but-for cause of the adverse employment action."
*Tagupa*, 125 F. Supp. 3d at 1120-21 (quotation omitted).

Here, there are various problems with the arguments Jass makes.   First, the alleged instances of protected conduct are not actually protected.   Jass asserts that he reported consumer fraud in violation of Hawai'i law to Gulban.   The evidence reflects no such thing, however, as the email Jass sent to Gulban contains no such warning about violations of Hawai'i law.   *See* 6/26/19 Email from Jass to Gulban, Dkt. No. 92-49 at 1-2.[15]   Jass next asserts that he complained about CR not complying with a contract with the State of Hawai'i.   However, that is not what Jass states in his declaration–the only evidentiary support for this statement. Instead, in his declaration, Jass states that he "questioned whether or not CR was complying with contract terms with the State of Hawaii…."   9/8/21 Jass Decl. at ¶ 31.   That is not an example of an employee reporting "a violation or a suspected violation of" a contract with the State.   *See* HRS § 378-62(1)(B).   Jass also asserts that he reported the redirection of his business email account as potentially illegal under the Electronic Communications Privacy Act (ECPA).   Again, the evidence reflects no such thing.   Instead, the email to which Jass cites in his declaration

---

[15]The Court notes that, in his response brief, Jass does not cite any evidentiary support for this statement.   Dkt. No. 108 at 9.

reflects that, at best, Jass believed the action violated "various laws and personal privacy…."   9/8/21 Jass Decl. at ¶ 34 (referencing 7/19/19 Email from Jass to Joseph Ralph & Visco, Dkt. No. 107-7 at 1).   His ambiguous statement does not mention the ECPA, let alone meet the bar of reporting a suspected violation of a law "adopted pursuant to law of this State, a political subdivision of this State, or the United States[.]"   *See* HRS § 378-62(1)(A).

Second, at least some of the alleged instances of adverse employment actions are neither adverse nor employment actions.   Jass asserts that he was "admonished" for reporting alleged consumer fraud.   However, he cites no legal support for the contention that the admonishment he allegedly received constitutes an adverse action.   *See* Dkt. No. 108 at 9.   Jass asserts that he was "forced" to work through a preapproved vacation at the end of July 2019.   However, the record reflects that, in an email seeking preapproval of said vacation, Jass stated that he would be working for a third to two-thirds of the time and would combine the vacation with a "few days work" at a data center.   5/4/19 Email from Jass to Gulban, Dkt. No. 92-33 at 2-3.   Jass also asserts that he was blocked from personal healthcare, banking, and other online services.   However, he fails to explain how allegedly blocking him from *personal* matters such as these constitutes an *employment* action.   *See* HRS § 378-62 (providing that an employer

28

shall not discriminate against an employee "regarding an employee's compensation, terms, conditions, location, or privileges of employment"); *Crosby*, 876 P.2d at 1309 (explaining that "conditions" of employment should be read broadly to include "circumstances" of employment).   It is unclear how Jass' personal matters could be considered a "circumstance" of his employment.   The same logic applies to Jass' assertion that his personal credit cards were used by Defendants and that they closed his personal financial services accounts.   Jass simply fails to explain how either of those matters concerned a circumstance of his employment, particularly given that, at least the latter, and perhaps the former, took place *after* he was no longer employed.

The only evident adverse employment action that Jass faced was termination.   Defendants argue that Jass' termination was not causally connected to any protected activity because there were other reasons for his termination.   The Court agrees.   Notably, as discussed with respect to Claim One, Jass *admits* that he divulged confidential information to a third-party.   Moreover, the record reflects that this fact, along with Jass' alleged failure to restore work emails, were reasons for his termination.   6/25/21 Gulban Depo. at 21:23-22:14.[16]   Thus, even

---

[16]Jass asserts that he was not given proper notice of the "cause" for his termination.   Dkt. No. 108 at 13.   However, that is irrelevant to the analysis of this claim because the statute only

if the Court was willing to find that Jass had met his initial burden of showing that his protected activity was a "substantial or motivating factor" in his termination, there is no ground to find that he was terminated "because" of that activity. "But for" causation is lacking in the record, however liberally it may be construed in Jass' favor.

Accordingly, CR is entitled to summary judgment with respect to this claim.

3.    Claim Three: Civil Conspiracy

Defendants move for summary judgment on this claim−something which Jass does not oppose. *See* Dkt. No. 108 at 32. Therefore, Gulban and Visco are entitled to summary judgment on this claim.

4.    Claim Four: Violation of HRS Section 378-2(a)(1)(A)

In the SAC, Jass alleged that CR asked him "illegal questions designed to uncover information regarding his protected classes and made derogatory comments towards minority employees." SAC at ¶ 97. In the motion for summary judgment, Defendants argue that this claim fails because Jass has not established a prima facie case of discrimination and, even if he had, there is no evidence that the reasons given for terminating him were pretextual. Dkt. No. 92-

---

requires that a termination "would have occurred regardless of the protected activity." *Crosby*, 876 P.2d at 1310.

1 at 26-29.   In response, Jass argues that he has established a prima facie case and there is sufficient evidence of pretext.   Dkt. No. 108 at 20-24.

In Hawaiʻi, when circumstantial evidence of discrimination is relied upon,[17] the elements of a prima facie claim under Section 378-2(a)(1)(A) are: (1) the plaintiff is a member of a protected class; (2) the plaintiff is qualified for the position from which he was terminated; (3) the plaintiff suffered an adverse employment action; and (4) the position still exists.   *Nozawa v. Operating Eng'rs Local Union No. 3*, 418 P.3d 1187, 1199 (Haw. 2018).   If the plaintiff establishes a prima facie case, "the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action."   *Id*. (quotation omitted).   Finally, "if the employer rebuts the prima facie case, the burden reverts to the plaintiff to demonstrate that the defendant's proffered reasons were pretextual."   *Id*. (quotation and internal quotation omitted).   "A plaintiff may establish pretext either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.   *Shoppe v. Gucci Am., Inc.*, 14 P.3d 1049, 1060 (Haw. 2000).

---

[17]In light of the arguments made in Jass' response, it appears that he relies upon circumstantial evidence.   *See* Dkt. No. 108 at 18-19 ("Discrimination may be proven by circumstantial evidence.").   In any event, there is no direct evidence of discrimination here.

Here, Jass has failed to both (1) put forward evidence to establish each of the elements of his prima facie case, or (2) provide any evidence that the stated reasons for his termination were pretextual.   First, Jass acknowledges that a prima facie case requires him to show that he was qualified for the position in which he suffered an adverse action and that the position still exists.   Dkt. No. 108 at 18. Despite that, Jass fails to mention how those elements have been met or point to a single piece of evidence supporting either.[18]   Nor has the Court discovered any such evidence in the record.   Therefore, even if Jass accurately argues that there are genuine issues of disputed fact with respect to *two* of the prima facie elements, there is no such dispute over the other two.

Second, even if Jass had established his prima facie case, as discussed *supra*, Defendants have presented more than enough evidence that he was terminated for, *inter alia*, divulging confidential information, a legitimate, nondiscriminatory reason for their actions.   *See* Dkt. No. 108 at 20-24.   Therefore, the burden falls on Jass to show that this reason was pretextual.   He has failed to do so.   Jass asserts that inappropriate questions and comments from Defendants "constitutes evidence of discriminatory intent…."   Dkt. No. 108 at 21.   Jass provides no

---

[18]Instead, with respect to the existence of their former positions, Jass and Wong merely state those positions "remain open" (Dkt. No. 108 at 20) without any citation to record evidence.

explanation why.   This is particularly so where, as here, many of the alleged comments and questions occurred prior to May 1, 2019−*i.e.*, *before* Jass was even hired by CR.   *See Collins Foods Int'l, Inc. v. U.S. Immigration & Naturalization Serv.*, 948 F.2d 549, 552 (9th Cir. 1991) ("Pre-employment questioning…exposes the employer to charges of discrimination *if he does not hire that applicant*.") (emphasis added).

Jass next argues that Defendants did not investigate his complaints of discrimination.   However, there is no evidence in the record that Jass made any such complaints to Defendants.   Rather, at best, the evidence to which Jass cites, *see* Dkt. No. 108 at 21 (citing Dkt. No. 107 at ¶ 33), indicates CR did not investigate complaints made by Wong.   Jass next relies upon Gulban allegedly saying that Jass had performed diligently and that Jass was entitled to COBRA benefits.   However, contrary to Jass' assertion, Dkt. No. 108 at 22, it is not "talk[ing] out of both sides of their mouth" for Jass to be terminated for his admitted divulging of confidential information and for Gulban to allegedly say he performed diligently or for Jass to be eligible for COBRA benefits.   Jass also argues that his explanation for why he could not return work emails to the server demonstrates pretext.   *Id*. at 22-23.   Again, that assertion is entirely unexplained. Finally, Jass asserts that "similarly-situated employees were treated better."   Dkt.

No. 108 at 23.   The only such employee Jass points to, however, is Gulban, without providing any explanation for why he and Gulban should be considered similarly situated.   *See id*. at 23-24.   Therefore, this too does not constitute pretext.

Accordingly, CR is entitled to summary judgment with respect to this claim.[19]

5.      Claim Five: Violation of HRS Section 378-2(a)(2)

In Hawaiʻi, the following three-part burden-shifting test exists for claims under HRS Section 378-2(a)(2):

> (1) the plaintiff must first establish a prima facie case…by demonstrating that (a) the plaintiff (i) has opposed any practice forbidden by [statute] or (ii) has filed a complaint, testified, or assisted in any proceeding respecting the discriminatory practices prohibited under [the statute], (b) his or her employer…has discharged, expelled, or otherwise discriminated against the plaintiff, and (c) a causal link existed between the protected activity and the adverse action; (2) if the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action; and (3) if the defendant articulates such a reason, the burden shifts back to the plaintiff to show evidence demonstrating that the reason given by the defendant is pretextual.

---

[19]The Court notes that, to the extent this claim alleges a hostile work environment, Jass does not oppose Defendants' request for summary judgment.   Dkt. No. 108 at 17.   Therefore, to the extent any such claim is alleged, CR is entitled to summary judgment with respect to the same.

*Lales v. Wholesale Motors Co.*, 328 P.3d 341, 365-366 (Haw. 2014).   In other words, like Claim Four discussed above, this claim too, once a prima facie case has been established, requires the employer to articulate a legitimate, nondiscriminatory reason for any adverse employment action and, if so, for the employee to show that such reason was pretextual.   As discussed above, Defendants have articulated a legitimate, nondiscriminatory reason for Jass' termination–divulging confidential information to a third-party.   Further, the Court has addressed Jass' arguments regarding pretext, to which none are added in Jass' discussion of this claim, *see* Dkt. No. 108 at 28, and found none to be convincing.

Accordingly, CR is entitled to summary judgment with respect to this claim.[20]

6.    Claim Six: Violation of HRS Section 378-2(a)(3)

In the SAC, Jass alleged that Gulban and Visco "aided and abetted" his termination, as well as unwelcome and harassing behavior toward him.   SAC at ¶

---

[20]The Court adds that it is far from clear whether Jass opposed any allegedly discriminatory practice for purposes of his prima facie case.   The only support for such a contention are the statements in Jass' declaration that he "did politely object to the first few of Gulban's racially insensitive and stereotypical statements[,]" but "Gulban never apologized or changed his behavior, which discouraged [Jass] from more strongly objecting."   9/8/21 Jass Decl. at ¶¶ 25-26.   This distinctly ambiguous statement fails to illuminate when Jass allegedly objected, to whom he objected, or how he made his objection.

113.   Defendants move for summary judgment, arguing that this claim fails because the underlying claims of discrimination also fail.   Dkt. No. 92-1 at 34. Defendants further argue that Gulban and Visco cannot be liable for aiding and abetting Jass' termination when Jass alleges that they were the ones who terminated him.   *Id*. at 35.   In response, Jass argues that there are genuine issues of fact with respect to this claim because Gulban promised to "build a file" against him and Gulban and Visco failed to act on his complaints of discrimination.   Dkt. No. 108 at 28-29.

Section 378-2(a)(3) provides that it shall be unlawful for any person "to aid, abet, incite, compel, or coerce the doing of any of the discriminatory practices forbidden by [the statute], or to attempt to do so[.]"

Here, the Court agrees with Defendants that, because they are entitled to summary judgment with respect to the above-discussed discrimination claims, Gulban and Visco cannot be liable for aiding and abetting nondiscriminatory conduct.   Further, even if the Court had ruled differently with respect to the earlier claims, Gulban and Visco would still not be liable under Section 378-2(a)(3). First, by failing to address it in his response, Jass appears to have wisely abandoned his allegation that Gulban and Visco aided and abetted themselves in terminating Jass.   *See* Dkt. No. 108 at 28-29; *Digby Adler Group, LLC v.*

36

*Mercedes-Benz U.S.A., LLC*, 2015 WL 5138080, at *2 (N.D. Cal. Sep. 1, 2015) (finding the failure to respond to an argument for dismissal of a claim to be an "abandonment" of the claim).

Second, in his response, Jass instead asserts that Gulban and Visco aided and abetted discrimination related to "his discrimination complaint."   Dkt. No. 108 at 29.   Although Jass does not identify the "discrimination complaint" that he mentions, presumably he means the same complaint he relied upon in Claim Five above−*i.e.*, his "polite[] object[ion]" to Gulban's "racially insensitive and stereotypical statements…."   9/8/21 Jass Decl. at ¶ 10.   As just mentioned, however, Gulban cannot have aided and abetted himself with respect to those statements.   As for Visco, Jass identifies no conduct committed by Visco that even might constitute aiding and abetting.   Jass merely asserts that Visco "continued to build the file" until he was terminated.   Dkt. No. 108 at 29.   However, he cites no evidence for this.   Jass also asserts that Visco failed to do anything in response to his complaints.   *Id*.   Again, there is no evidence of this in the record.   Instead, the evidence Jass cites, Dkt. No. 107 at ¶ 33, at most, shows that a different employee, Fee, did not investigate complaints by Wong.   Finally, Jass does not explain how these alleged acts by Visco, assuming they occurred, aided and abetted *another*.

Accordingly, Gulban and Visco are entitled to summary judgment with respect to this claim.

7.    Claim Seven: Violation of ERISA/COBRA

In the SAC, Jass alleged that CR violated ERISA/COBRA by failing to provide him with statutorily required notice related to his insurance coverage. SAC at ¶¶ 120-121.   Defendants move for summary judgment on the ground that the notice Jass alleges was not sent to him can only be sent by a "plan administrator" and CR was not the plan administrator of the relevant insurance plan.   Dkt. No. 92-1 at 38-39.   In response, Jass argues that CR was the administrator of the relevant health plan, CR sent him correspondence stating that he would be eligible for COBRA benefits, Visco stated that COBRA paperwork would be sent to him, and Fee took over managing SMC's benefits.   Dkt. No. 108 at 30-31.

Jass also moves for summary judgment on this claim.   Dkt. No. 93 at 9-20. He argues that CR, along with SMC, was his "joint employer" and, after his termination, failed to send him notice that he could continue coverage under his health plan.   In response, Defendants argue, once more, that CR was not the plan administrator of the relevant health plan and, thus, pursuant to statute, they cannot be liable for any failure to provide the required notice.   Dkt. No. 102 at 9-10.

38

As this Court has explained in a prior Order, the ERISA "statutes are clear: Penalties under 29 U.S.C. § 1132(c)(1) can only be assessed against 'plan administrators' for failing to produce documents that they are required to produce as plan administrators." Dkt. No. 36 at 27 (quotation and citation omitted). The Court further explained that "plan administrators" and "employers" "are separate entities with separate definitions under ERISA." *Id*. at 28. Evidently, Jass did not take the Court's explanations to heart. In his motion for summary judgment, Jass spends the vast majority of the briefing on this claim explaining why CR was his joint employer. Dkt. No. 93 at 9-18. Even if true, that is not an issue relevant to this claim, and Jass fails to explain otherwise.[21] Put simply, at no point in either his motion for summary judgment or his response to Defendants' motion for summary judgment, does Jass present any evidence that CR was the plan administrator for the relevant health plan or that the relevant health plan did not designate an administrator. *See* 29 U.S.C. § 1002(16)(A) (in relevant part, defining "administrator" as meaning (i) the person specifically so designated by the terms of the instrument under which the plan is operated, or (ii) if an administrator is not so designated, the plan sponsor). Instead, Jass contends that CR sent him a letter stating that he would be eligible for continued coverage under COBRA,

---

[21]Instead, Jass cites to case law involving Title VII litigation. Dkt. No. 93 at 10.

Visco stated that COBRA paperwork would be sent to him, and Fee took over managing SMC's benefits.   None of these contentions, even if true,[22] shows that CR was the designated plan administrator.

Accordingly, CR is entitled to summary judgment with respect to this claim, and Jass is not.

        8.      Claims Eight and Nine: Unjust Enrichment and Conversion

In the SAC, Jass alleged that Defendants were unjustly enriched and/or had wrongfully detained his property after using his credit cards to make charges for their own benefit and without his consent.   SAC at ¶¶ 130, 137.   Defendants move for summary judgment on these claims arguing, first, that they fail against Gulban and Visco because there is no evidence that they were personally enriched by any use of Jass' credit cards and, second, that they fail against CR because certain contracts between the parties govern the alleged misuse of the credit cards. Dkt. No. 92-1 at 36-37.   In response, Jass asserts that he has been damaged by Defendants' use of his cards "solely for their business."   Dkt. No. 108 at 32.

In Hawai'i, the elements of an unjust enrichment claim are as follows: (1) the plaintiff conferring a benefit upon the defendant by adding to defendant's

---

[22]Some of Jass' contentions, in fact, are not true.   Notably, the letter Jass relies upon was sent by SMC, not CR.   *See* Dkt. No. 93-7.   As for Visco's statement, that was made in his capacity as "Secretary" of SMC, not in any capacity related to CR.   *See id.*

"security or advantage" (2) with the retention of any such benefit being unjust. *Durette v. Aloha Plastic Recycling, Inc.*, 100 P.3d 60, 74 (Haw. 2004) (quotation omitted).   The elements of a conversion claim are as follows: "(1) A taking from the owner without his consent; (2) an unwarranted assumption of ownership; (3) an illegal use or abuse of the chattel; and (4) a wrongful detention after demand." *Freddy Nobriga Enters., Inc. v. State Dep't of Hawaiian Home Lands*, 295 P.3d 993, 999 (Haw. Ct. App. 2013) (quotation omitted).

Here, as to Gulban and Visco, Jass does not address, let alone challenge, Defendants' assertion that Gulban and Visco did not personally retain any benefit or detain any amount from Jass' credit cards.   Instead, he appears to concede that any such retention or detention was "solely" for Defendants' business.   Dkt. No. 108 at 32.   Therefore, the Court finds summary judgment on these claims appropriate as to Gulban and Visco.

The result is not the same, however, with respect to CR.   In their motion for summary judgment, Defendants assert that Jass is not entitled to an unjust enrichment or conversion remedy because any equitable remedy he may have is covered by contracts between the parties.   Dkt. No. 92-1 at 37.   Defendants then rely upon at least two agreements and conclude by asserting that the alleged credit card charges concern "what the parties owe each other pursuant to the various

41

contracts." *Id.*   Defendants cite no authority, however, for this proposition. Specifically, while Defendants cite various provisions of the agreements between the parties, at no point do they cite any evidence to support the notion that the credit card misuse Jass alleges in the SAC is "covered" by those provisions. Rather, Defendants appear to believe that the Court will simply accept that notion, which the Court declines to do.[23]   Therefore, the Court denies summary judgment to CR on these claims.

## II.   **Wong's Complaint**

1.     Claim One: Breach of Contract

In his Complaint, Wong alleges that CR breached his EA by demoting him, making it difficult for him to perform his job, and, in terminating him for "cause," by failing to follow the procedures required by the EA.   Compl. at 23 (¶¶ 88-89). In their motion for summary judgment, Defendants do not directly address Wong's allegation regarding his demotion.   *See* Dkt. No. 92-1 at 17-22.   Instead, Defendants argue that Wong's claim fails, regardless of its basis, because he failed to perform under the EA.   Dkt. No. 92-1 at 18-22.   Specifically, Defendants

---

[23]This is particularly so where the argument Defendants make is more appropriately considered a *defense* to Jass' claims, rather than an *element* that he must prove.   *See Cheatham v. ADT Corp.*, 2016 WL 1752959, at *1 (D. Ariz. May 3, 2016) ("But the existence of a fully integrated contract that specifically governs the rights and obligations at issue in this case may be a valid defense to Plaintiff's unjust enrichment claim.").

contend that Wong failed to restore work emails to company servers and refused to work.   In response, Wong argues that, because he was fired for "cause," his EA required Defendants to give him notice of his alleged transgressions and an opportunity to cure them.   Dkt. No. 108 at 3-7.   Wong asserts that he did not receive any notice.   He further asserts that allegations he refused to work are false, and he could not return work emails to company servers even if he wanted to.

The Court finds that there are disputed facts that preclude summary judgment.   First, there is no undisputed evidence that Wong received the notice mandated by Section 10(e)(i) of his EA, one of the principal bases of Claim One. Defendants appear to assert that such notice was contained in emails instructing Wong to restore work emails to company servers.   Dkt. No. 92-1 at 19; Dkt. No. 109 at 4; Dkt. No. 92-2 at ¶¶ 26, 38 (citing Dkt. Nos. 92-57, 92-74).   However, having reviewed those emails in the light most favorable to Wong as the non-movant, a jury could find that they did not give Wong notice "specifying in reasonable detail the act(s) or omission(s)" SMC believed constituted cause.   *See* Dkt. No. 107-11 at ¶ 10(e)(i).   For example, the emails do not even mention "cause" or Section 10(e)(i) or termination.   The record is even more tenuous with respect to the matter of Wong refusing to work, with Defendants pointing to no evidence of Wong being notified of the acts or omissions SMC believed

43

constituted cause.   *See* Dkt. No. 92-1 at 21-22; Dkt. No. 109 at 5-6.   At most, Defendants' evidence merely shows Wong being instructed or asked to do certain work.

Second, while the dispute may not involve evidence of equal weight, at this juncture, there are also disputed facts as to Defendants' principal argument: that Wong failed to perform under the EA because he did not return work emails and refused to work.   As to the former, while Defendants contend that Wong never returned work emails upon request, something which is undisputed, Wong asserts that he *could not* return the emails.   While the evidence in support of Wong's position may (or may not) be believed by a jury, particularly in light of the evidence supporting a contrary position, such as the ability of others to heed the same company request, that is not for this Court to decide on summary judgment.[24]

As for Wong allegedly refusing to work, Defendants assert that Wong refused to identify company property returned by Jass, refused to turn over employee files, instructed SMC to continue paying Jass even after Jass'

---

[24]Defendants argue that Wong's statements are "self-serving" and, thus, should not be considered.   Dkt. No. 109 at 4.   However, the case to which Defendants cite, *Hochroth v. Ally Bank*, 461 F. Supp. 3d 986, 1005 (D. Haw. 2020), states that self-serving statements should be discounted when they are not corroborated by evidence *and* contradicted by documentary evidence.   Here, while there may not be any evidence to support Wong's statements, nor is there any evidence that *contradicts* the same.

termination, refused to work on an audit, and refused to provide information regarding COBRA benefits.   Dkt. No. 92-1 at 21-22.   These assertions are disputed.   For example, the evidence is not clear whether Wong even agreed that Jass gave him company property to return, much less that Wong refused to identify it.   *See* 9/6/19 Emails between Wong & Gulban, Dkt. No. 92-72 at 1-3.   It is similarly unclear from the evidence whether Wong instructed SMC to continue paying Jass after Jass' termination or that Wong's position gave him the authority to do so.   *See* 9/30/19 Email from Wong to Jass & Gregory Krylov, Dkt. No. 92-77.   As for the remaining matters, while Wong may not dispute them,[25] Defendants provide no explanation how the same constitute "fraud, dishonesty or gross misconduct that is materially and demonstratively injurious" or an "intentional and sustained disregard of a policy of [SMC]."   *See* Dkt. No. 92-1 at 21-22.   Rather than simply presuming the same, as Defendants appear to wish, the Court, instead, will leave it for a jury to decide.

Therefore, in the light most favorable to Wong, there is no undisputed evidence that he failed to perform under his EA in the manner asserted by CR.

---

[25]For example, with respect to failing to provide historic COBRA information, Wong's response is: "Wong did not provide the requested information at the time he received the email dated November 15, 2019, but the fact that Defendants eventually provided Jass the COBRA forms as they had promised indicates they had the necessary information."   Dkt. No. 121 at ¶ 41.   That does not *dispute* Defendants' underlying assertion.

Because this is the only basis upon which Defendants seek summary judgment on this claim, their motion is denied with respect to the same.

        2.      Claim Two: Violation of HRS Section 378-62

        In his Complaint, Wong alleged that he engaged in protected activity under the HWPA by complaining about violations of federal and state law and making a complaint to a government agency.   Compl. at 24-25 (¶¶ 94-97).   Wong further alleged that his employment was terminated due to his complaints.   *Id*. at 25 (¶¶ 98-99).   Defendants argue that this claim fails because Wong was terminated for reasons unrelated to his alleged protected activity−specifically, for failing to restore work emails and refusing to work.   Dkt. No. 92-1 at 23-24.   In response, Wong argues that he complained about potentially illegal activity under the ECPA, and he filed a complaint with the Department of Labor.   Dkt. No. 108 at 10, 14-15.   He identifies alleged retaliatory conduct in the form of being required to report to CR employees, a change in his job duties, and his termination.   *Id*. at 11-12, 14-15.

        Here, Wong's arguments suffer a similar fate as those made by Jass in support of his HWPA claim.   First, like Jass, Wong has not established through evidence that he complained to Defendants about potential violations of the ECPA.   Second, Wong has failed to establish a causal connection between any protected

activity and his termination.    As for the complaint about the ECPA, Wong states

in his declaration that this occurred sometime in July 2019.   9/8/21 Wong Decl. at

¶ 17.[26]    There is, thus, no evidence to support that Wong was required to report to

CR employees after this complaint.[27]    As for the complaint to the Department of

Labor, Wong provides no *admissible* and/or supportable evidence that Defendants

were aware of the same.[28]    More specifically, Wong cites his own declaration and

the deposition of Gulban.   Dkt. No. 107 at ¶ 34.   The cited part of Gulban's

testimony, however, does not even mention the complaint.   *See* Dkt. No. 107-27 at

52:1-53:25.   As for Wong's declaration, while it does state that the Department of

Labor contacted Defendants on December 2, 2019, *see* 9/8/21 Wong Decl. at ¶ 32,

Wong provides no foundation for how he has knowledge of this purported fact.

*See* Fed.R.Evid. 602 (concerning a witness' need for personal knowledge of a

---

[26]Given that there is no documentary evidence in support of this assertion, such as an email with a time-stamp, its ambiguity is perhaps understandable.

[27]The evidence to which Wong cites to support his contention that Fee took over his "most important" job duties also is unsupported.   Notably, the emails to which Plaintiffs cite in their concise statement of facts in opposition (Dkt. No. 107) and in Wong's declaration (Dkt. No. 107-10) do not show that Fee took over benefits for SMC.   Instead, the cited emails only show either that Fee was taking over benefits for HopOne (7/30/19 Email from Fee to Wong, Dkt. No. 107-14) or that *Wong believed* that Fee had taken over benefits for SMC (8/12/19 Email from Wong to Jeff Andelman, Dkt. No. 107-15).   The Court also notes that the first exhibit discussed above (Dkt. No. 107-14) does not appear to be a complete document, given that, at the top of the page, there is hanging language that reads: "Haralds would be on Superb Management's benefits, which she did not take over. I understand SM/SD benefits to still be your responsibility."

[28]The Court notes that Defendants have objected to the admissibility of this assertion.   Dkt. No. 109 at 10; *see* Fed.R.Civ.P. 56(c)(2) (providing that a party may object to cited material on the ground that it "cannot be presented in a form that would be admissible in evidence.").

matter).    There is, thus, no evidence this Court can consider showing a causal connection between the complaint to the Department of Labor and Wong's termination.    *See You v. Longs Drugs Stores Cal., LLC*, 937 F. Supp. 2d 1237, 1258 (D. Haw. 2013) (explaining that a causal link may be established by circumstantial evidence "'such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision.'") (quoting *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)).

Finally, even if Wong had established a prima facie case under Section 378-62, Defendants have asserted legitimate, nondiscriminatory reasons for his termination, including his failure to return work emails.    *See* 12/3/19 Letter from Gulban to Wong at 2-4.    In his response to the motion for summary judgment, Wong does not contest these reasons as being legitimate and nondiscriminatory. *See* Dkt. No. 108 at 8-16.    Moreover, Wong does not even argue that Defendants' reasons were pretextual.    *See id*.    Only Jass makes that argument.    *See id*. at 13 ("Still, Jass's testimony indicates the reasons given for the termination were mere pretext.").    In any event, there is no dispute or evidence contradicting that SMC gave Wong various reasons for why he was terminated that were legitimate and nondiscriminatory.    Wong has provided no evidence (or argument) that those

48

reasons were pretextual.   For example, Wong *admits* that he did not return work emails.   Wong Depo. at 154:17-19.   Although he contends doing so was not possible, that does not mean that SMC did not have reason to terminate him for failing to do so, particularly where, as here, every single other employee asked to return emails was able to complete that task.   *See* Nunes Decl. at ¶ 13.

Accordingly, CR is entitled to summary judgment with respect to this claim.

3.      Claim Three: Violation of HRS Section 378-2(a)(1)(A)

In his Complaint, Wong alleged that Gulban made "derogatory statements" about minority employees and made comments indicating preference for "white, male, American born and straight employees…."   Compl. at 26 (¶¶ 106-107). Defendants argue that summary judgment is appropriate on this claim because Wong has not established a prima facie case of discrimination and, even if he had, CR had a legitimate reason for terminating Wong, and there is no evidence of pretext.   Dkt. No. 92-1 at 26-29.   In response, Wong argues that, after May 1, 2019, Gulban made "derogatory comments towards minority employees[,]" he suffered adverse employment actions after his trip to New Jersey in June 2019, and there is evidence of pretext.   Dkt. No. 108 at 20-24.

Wong's discrimination claim is even more insubstantial than the one made by Jass.   First, like Jass, Wong fails to demonstrate that he was qualified for his

49

former position or that the position still exists.   *See generally id.*; *supra* n.18.

Therefore, his prima facie case fails.   Next, as discussed above with respect to

Claim Two, CR has presented evidence of legitimate, nondiscriminatory reasons

for terminating Wong, including his failure to return work emails.

This leaves pretext, which Wong makes even less effort to dispute than Jass.

Like Jass, Wong fails to explain why the questions he was asked demonstrate

discriminatory intent.   *See* Dkt. No. 108 at 21.   Likewise, Wong fails to explain

how the alleged failure to investigate his claims of discrimination reflects a

discriminatory intent.   *See id*. at 21-22.   Moreover, the cases to which he cites,

*Bator v. State of Hawaii*, 39 F.3d 1021, 1029 (9th Cir. 1994), and *McGinest v. GTE*

*Serv. Corp.*, 360 F.3d 1103, 1122-24 (9th Cir. 2004), are inapposite, given that the

first is cited for a principle related to qualified immunity, *see* Dkt. No. 108 at 21,

which is not at issue here, and the second involved a hostile work environment

claim, something which Wong has abandoned, *see id*. at 17.   Further, like Jass,

Wong fails to provide any explanation for why *his* failure to return work emails

constitutes discrimination by *CR*.   *See id*. at 22-23.

Next, Wong asserts that, although Defendants claim he did not help

complete an audit process, he "did the work necessary to have the ISO audit

process and certification process completed and provided the information to allow

CR access to the work." *Id*. at 23.   Putting aside that Wong's response does not

dispute that he failed to help complete the audit process, he also fails to explain

how the work he allegedly performed demonstrates pretext.   At most, in his

declaration, Wong cites to one September 2019 email in which he sent links to

documents related to part of the audit process.   *See* 9/8/21 Wong Decl. at ¶ 38

(citing 9/11/19 Email from Wong to Raymond Cho, Dkt. No. 107-21).   That,

however, fails to address why, in October 2019, he refused to work on the audit

process.   *See* 10/24/19 Email from Wong to Raymond Cho, Dkt. No. 97-78 at 2.

Accordingly, for these reasons, CR is entitled to summary judgment with

respect to this claim.[29]

### 4.    Claim Four: Violation of HRS Section 378-2(a)(2)

In his Complaint, Wong alleged that he filed a charge of discrimination in

September 2019 and, on December 3, 2019, his employment was terminated.

Compl. at ¶¶ 114-116.   In their motion for summary judgment, Defendants argue

that they are entitled to relief for the same reasons raised with respect to Claim

Three.   Dkt. No. 92-1 at 24-29.   In response, Wong too asserts that the evidence

---

[29]Like Jass, Wong also does not oppose summary judgment to the extent this claim alleges a hostile work environment.   Dkt. No. 108 at 17.   Therefore, CR is entitled to summary judgment on this claim in that respect as well.

produced in support of Claim Three establishes pretext for this claim.   Dkt. No. 108 at 28.

Here, for reasons already discussed herein, this claim fails.   First, while Wong asserts that Defendants became aware of his complaint to the Department of Labor on December 2, 2019, as discussed, there is no admissible evidence to support this claim.   *See supra* § II.2; *You*, 937 F. Supp. 2d at 1258.   Second, as just discussed with respect to Claim Three, none of the arguments Wong makes with respect to pretext hold water.   This is particularly so in relation to Wong's complaint to the Department of Labor, given that none of the arguments discussed above concern pretext in the context of said complaint.   Rather, they concern pretext with respect to alleged discriminatory comments and questions made in May or June 2019.

Accordingly, CR is entitled to summary judgment with respect to this claim.

5.    Claim Five: Civil Conspiracy

Like Jass, in his response to the motion for summary judgment, Wong does not oppose summary judgment for Gulban and Visco on this claim.   Dkt. No. 108 at 32.   Therefore, the motion for summary judgment is granted with respect to this claim.

III.    **Counterclaims Against Jass**

1.    Claim One: Conversion

In their Counterclaims against Jass ("Jass Counterclaims"), Defendants first alleged that Jass wrongfully retained business emails that belonged to HopOne and SIT for his personal benefit, such as to hide unflattering information.   Jass Counterclaims at ¶ 71, Dkt. No. 40.   In his motion for summary judgment, Dkt. No. 94, Jass argues that this claim fails because he was not an employee of CR prior to May 1, 2019, and, to the extent he owed any duty to CR prior to May 1, 2019, any such duty would be "encompassed" by the SAPA, the terms of which are being litigated elsewhere.   *Id*. at 2-4.   In response, Defendants argue that the SAPA does not address post-acquisition, *i.e.*, post-May 1, 2019, actions.   Dkt. No. 106 at 12.

Here, review of the foregoing, reconcilable arguments suggests a straightforward resolution.   Notably, the parties appear to talk past each other, given that Jass concerns himself solely with emails allegedly misappropriated *before* May 1, 2019, while Defendants only challenge emails *after* May 1, 2019. Therefore, to the extent this claim concerns the conversion of property retained on or before May 1, 2019, Jass' motion for summary judgment is granted.   To the

extent the claim concerns property retained *after* May 1, 2019, the motion is denied.[30]

2.      Claim Two: Fraudulent Concealment

In the Jass Counterclaims, Defendants alleged that Jass had a duty to disclose that he and Wong were diverting company emails to personal email accounts, but failed to do so.   Jass Counterclaim at ¶ 80.   It is also alleged that Jass failed to disclose information related to KL canceling services.   *Id*. at ¶ 82. In his motion for summary judgment, Jass argues that this claim fails because he did not "actively conceal" information from CR, and his conduct did not prevent CR from asserting a cause of action for conversion.   Dkt. No. 94 at 6-7.   In response, Defendants argue that Jass' arguments are irrelevant.   Dkt. No. 106 at 13-14.

The Court agrees with Defendants.   Having reviewed the counterclaim as alleged, it is evident that Defendants are not alleging that they were hindered in asserting a cause of action against Jass due to his alleged conduct.   Instead,

---

[30]The Court notes that, in his reply, Dkt. No. 111, Jass argues that he is entitled to summary judgment on Claim One because Defendants conceded that he did not retain a benefit for purposes of a conversion claim.   *Id*. at 6-7.   Jass, however, did not raise this argument in relationship to Claim One in his underlying motion for summary judgment.   *See* Dkt. No. 94 at 2-4.   Instead, he raised it only with respect to a different claim.   *See id*. at 12-13.   Therefore, the Court declines to consider this argument in connection with Claim One.

Defendants alleged that Jass had a duty to disclose information to them, he failed to do so, whether affirmatively or by omission, and they were injured.   The only question, therefore, is whether Defendants can assert such a claim under the rubric of fraudulent concealment.   On that front, Jass cites no authority suggesting they cannot.   Notably, the authority he does cite concerns cases where the issue of fraudulent concealment has been raised in order to preserve a claim that would otherwise be barred by the statute of limitations.   *See Hancock v. Kulana Partners, LLC*, 992 F. Supp. 2d 1053, 1061-62 (D. Haw. 2014); *Mroz v. Hoaloha Na Eha, Inc.*, 360 F. Supp. 2d 1122, 1129 (D. Haw. 2005).   These cases do not address what constitutes fraudulent concealment and are not relevant to the circumstances presented here.

Accordingly, Jass is not entitled to summary judgment on this claim.

3.      Claim Three: Breach of Contract

In the Jass Counterclaims, Defendants alleged that, although Jass' EA is a contract between SMC and Jass, to the extent CR was Jass' employer or co-employer, CR should be entitled to assert a breach of contract claim against Jass. Jass Counterclaims at ¶¶ 98, 101.   In that regard, Defendants alleged that Jass breached his EA by, *inter alia*, divulging confidential information.   *Id*. at ¶¶ 104-107, 109.   Jass moves for summary judgment, arguing that CR is neither a party to

55

the EA nor a third-party beneficiary and, thus, cannot maintain a claim against him based on the EA.   Dkt. No. 94 at 7-9.   In response, Defendants argue that it would be "inequitable" should CR be found to be the "alter ego" of SMC, as alleged by Jass, but not allowed to sue under the EA.   Dkt. No. 106 at 14-15.   They also argue that CR was "clearly intended" to benefit from the EA and, thus, should be considered a third-party beneficiary of the same.   *Id.* at 15-17.

The Court agrees with Jass that CR cannot maintain a cause of action for breach of his EA.   First, it is undisputed that the parties to the EA are Jass and SMC, not CR.   Dkt. No. 93-3 at 1.   Second, in Hawaiʻi, the purpose of the "alter ego" doctrine upon which CR relies is to prevent "injustice and inequity…when there is evidence that the corporate fiction has been used to perpetrate a fraud or defeat a rightful claim."   *Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe Transp. Co.*, 982 P.2d 853, 869-70 (Haw. 1999) (quotation omitted), *superseded by statute on other grounds as noted in Davis v. Four Seasons Hotel Ltd.*, 228 P.3d 303, 308 n.9 (Haw. 2010).   In other words, the doctrine is designed to prevent an injustice caused *by* a corporate fiction, not *on* the corporate fiction.   Third, the principal case to which Defendants cite concerns the application of equitable estoppel under California law in the context of arbitration agreements.   *See* Dkt. No. 106 at 14-15 (citing *Amergence Supply Chain Mgmt. Inc. v. Changhong (Hong Kong) Trading*

*Ltd.*, 2016 WL 8234652, at *5-7 (C.D. Cal. Apr. 21, 2016)).   Defendants fail to explain why similar principles should apply here under Hawai'i law or, even if they did, how the elements of equitable estoppel have been met.

Defendants' remaining argument is that CR was a third-party beneficiary of Jass' EA.   After reviewing the EA, the Court does not agree.   In Hawai'i, "[a] third party beneficiary is one for whose benefit a promise is made in a contract but who is not a party to the contract."   *Siopes v. Kaiser Found. Health Plan, Inc.*, 312 P.3d 869, 888 (Haw. 2013).   In resolving this issue, Hawai'i applies the following framework:

> Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

*Jou v. Dai-Tokyo Royal State Ins. Co.*, 172 P.3d 471, 480-481 (Haw. 2007) (quotation omitted).

Here, Defendants make no effort to even recognize this framework, let alone apply it to the EA.   *See* Dkt. No. 106 at 15-17.   Moreover, the only provision of the EA that Defendants contend actually benefits CR is one providing that Jass would not be prohibited from pursuing business activities that are not in

competition with SMC, HopOne, or CR.   *See id*. at 16 (citing Dkt. No. 92-30 at ¶¶ 3(a), 3(b).[31]   None of the other purported benefits in the EA benefit CR directly. Instead, at most, they benefit CR incidentally as the purported client of SMC or as the owner of other purported beneficiaries.   *See Jou*, 172 P.3d at 481 (providing that "[a]n incidental beneficiary is a beneficiary who is not an intended beneficiary.") (quotation omitted).

Accordingly, Jass is entitled to summary judgment on this claim.

4.   Claim Four: Breach of Good Faith and Fair Dealing

In the Jass Counterclaims, Defendants alleged that Jass violated an implied term of good faith and fair dealing in his EA by refusing to return work emails and revealing confidential information.   Jass Counterclaims at ¶¶ 118-119.   In addition, with regard to this counterclaim, CR seeks punitive damages.   *Id*. at ¶ 121.   Jass moves for summary judgment, arguing that there is no cause of action for tort damages in Hawaiʻi for breach of the covenant of good faith and fair dealing.   Dkt. No. 94 at 10-11.   In response, Defendants assert that courts allow claims for breach of the covenant of good faith and fair dealing to proceed as a breach of contract claim.   Dkt. No. 106 at 17-18.

---

[31]It is also not clear how this provision is related to any of the alleged breaches of Jass' EA identified in the relevant counterclaim.

Here, as Defendants assert, this claim involves an alleged breach of contract. *See* Jass Counterclaims at ¶¶ 118-119.   Like in Claim Three, though, the contract allegedly breached is Jass' EA.   *Id*. at ¶¶ 116-117, 119.   As discussed above, CR is not a party to the EA or a third-party beneficiary.   Therefore, irrespective of the damages CR could seek under this claim, CR cannot bring any claim related to the EA.[32]

Accordingly, Jass is entitled to summary judgment on this claim.

5.    Claim Five: Unjust Enrichment

In the Jass Counterclaims, Defendants alleged that Jass was unjustly enriched as a result of his misappropriation of work emails and bank funds.   Jass Counterclaims at ¶¶ 123-124.   In his motion for summary judgment, much like in the claim for conversion discussed above, Jass argues that the SAPA governs how work emails were handled "in connection with the May 1, 2019 transaction…." Dkt. No. 94 at 12.   Unlike the conversion claim above, Jass also argues that, when he was terminated, he deleted all of his work emails and, thus, could not have

---

[32]The Court notes that CR would not have been able to seek punitive damages.   *Francis v. Lee Enters., Inc.*, 971 P.2d 707, 717 (Haw. 1999) (holding that, when a contract is breached, "Hawaiʻi law will *not* allow a recovery in tort, including a recovery of punitive damages, in the absence of conduct that (1) violates a duty that is independently recognized by principles of tort law and (2) transcends the breach of the contract.") (emphasis in original).   Defendants make no argument that (1) and (2) apply here.

retained the benefit of the same.   *Id*. at 12-13.   In response, as they did with

Claim One above, Defendants again argue that Jass' arguments fail to address post-

May 1, 2019 activity.   Dkt. No. 106 at 11-12.

Here, the parties both once again largely talk past each other and fail to

address the arguments raised by the other.   *See supra* § III.1.   First, with respect

to *work emails*, Defendants again fail to oppose the idea that emails sent on or

before May 1, 2019 cannot be brought as part of this claim.   Second, Defendants

also fail to address Jass' argument that he did not retain any benefit from work

emails he received.   Instead, Defendants only address Jass' argument concerning

the SAPA.   *See* Dkt. No. 106 at 11-12.   Therefore, to the extent this claim is

premised upon Jass' alleged enrichment from work emails, he is entitled to

summary judgment with respect to the same.

Second, with respect to *bank funds*, it is Jass who fails to address the same.

Instead, both of his arguments in this regard−involving the SAPA and him not

retaining any benefit−concern only work emails, not bank funds.   Therefore,

because Jass has failed to make any argument in that regard, he is not entitled to

summary judgment to the extent this claim is premised upon bank funds.   *See*

*Celotex*, 477 U.S. at 323 (explaining that the movant's "initial responsibility" is to

inform the district court of the basis for its motion and to identify those parts of the

record "which it believes demonstrate the absence of a genuine issue of material fact.").

6.      Claim Six: Civil Conspiracy

In the Jass Counterclaims, Defendants alleged that Jass and Wong "acted in concert" to harm CR and enrich themselves by misappropriating work emails and concealing material facts.   Jass Counterclaims at ¶ 129.   Jass moves for summary judgment, arguing, first, that because he is entitled to dismissal of the predicate claims for the alleged conspiracy, this claim too should be dismissed.   Dkt. No. 94 at 13.   Second, Jass argues that Defendants failed to allege that he was acting as an individual during the conspiracy.   *Id*. at 14.   Third, Jass argues that this claim is barred by the "intracorporate conspiracy doctrine" because he and Wong were executives of SMC and a corporation like SMC cannot conspire with itself.   *Id*. at 14-15.   In response, Defendants argue that their predicate claims are not subject to dismissal, and there are disputed facts as to whether Jass and Wong were acting within the scope of their employment for purposes of the intracorporate conspiracy doctrine.   Dkt. No. 106 at 18-20.

In Hawai'i, civil conspiracy is the "'combination of two or more persons or entities by concerted action to accomplish a criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful

means.'"   *Miyashiro v. Roehrig, Roehrig, Wilson & Hara*, 228 P.3d 341, 362

(Haw. Ct. App. 2010) (quoting *Robert's Haw. Sch. Bus*, 982 P.2d at 881 n.28).

According to the intracorporate conspiracy doctrine, "an agreement between or

among agents of the same legal entity, when the agents act in their official

capacities, is not an unlawful conspiracy."   *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1867

(2017).[33]

Here, the Court is unpersuaded by the arguments Jass advances for dismissal

of this claim.   First, the Court has not entirely dismissed the underlying predicate

claims, which are those for conversion (Claim One) and fraudulent concealment

(Claim Two).   Second, contrary to the assertion in Jass' motion for summary

judgment, Defendants did not fail to allege that he was acting as an individual.

*See* Dkt. No. 94 at 13-14.   Rather, the allegations are clear on this point−Jass and

Wong are alleged to have acted to "enrich themselves and each other…."   Jass

Counterclaims at ¶ 129.[34]

---

[33]The Court notes that, with respect to the intracorporate conspiracy doctrine, neither party cites cases from the courts of the State of Hawai'i applying the doctrine to a civil conspiracy claim under State law.   Nonetheless, because both parties argue from the same script−*i.e.*, that the doctrine *legally*, if not factually, could apply here−the Court does not further address this issue herein.

[34]In his reply, Dkt. No. 111, Jass morphs this argument to challenge the *evidence* in support of Defendants' allegations, rather than the allegations of the Jass Counterclaims.   *See id.* at 12-13. That, however, is not the argument he advanced in his motion for summary judgment.   *See* Dkt. No. 94 at 14 ("CR failed to *allege* that Jass was acting as an individual and not as an agent of the employer.") (emphasis added).   The Court further notes that, although Jass appears to contend

Third, at this juncture, the Court disagrees that the intracorporate conspiracy doctrine applies factually to this case.   Jass' argument in this regard is premised on the contention that Jass and Wong were "executive[s]" of SMC.   Dkt. No. 94 at 14-15.   However, merely because Jass and Wong were allegedly executives of SMC does not mean they could not also act individually, and Jass provides no explanation otherwise.[35]

Accordingly, Jass is not entitled to summary judgment on this claim.

7.      Claim Seven: Interference with Prospective Business Advantage

In the Jass Counterclaims, Defendants alleged that, although HopOne and KL had a continuous business relationship, Jass "made sure" that, during the negotiations to sell HopOne, CR did not discover KL had been canceling services. Jass Counterclaims at ¶¶ 135, 137.   Defendants further alleged that, after May 1, 2019, Jass, in fact, represented that KL was looking to *increase* its business with HopOne.   *Id*. at ¶ 138.

---

that, "in order to establish a claim for civil conspiracy…CR would have to allege that they were acting as individuals…," Dkt. No. 94 at 13-14, the non-binding case to which he cites, *Stathos v. Bowden*, 728 F.2d 15, 21 (1st Cir. 1984), says no such thing.

[35]In addition, the intracorporate conspiracy doctrine is properly construed as a *defense* to a civil conspiracy claim.   *See, e.g.*, *Logan v. Salem Baptist Church of Jenkintown*, 2010 WL 3364203, at *5 (E.D. Pa. Aug. 17, 2010) ("The intra-corporate conspiracy doctrine is a defense that will negate the existence of a conspiracy…").   Therefore, should CR advance facts to support its civil conspiracy claim at trial, should he so choose, it will be Jass' burden to advance facts in support of the intracorporate conspiracy defense in the first instance.

In his motion for summary judgment, Jass argues that this claim is barred by the SAPA because, therein, CR agreed that it was provided with all financial information, and Jass did not make any representation about HopOne.   Dkt. No. 94 at 15-18.   Jass also argues that, due to the SAPA, CR could not expect KL to continue as a client, he acted within the scope of his employment, and there is no evidence he pursued an improper objective.   *Id*. at 19-22.   In response, Defendants argue that the SAPA is not relevant to Jass' conduct after May 1, 2019, Jass did not act within the scope of his employment, and disputed issues of fact exist as to the elements of this claim.   Dkt. No. 106 at 21-23.

In Hawaiʻi, the elements of the tort of intentional interference with prospective business advantage are:

> (1) The existence of a valid business relationship or a prospective advantage or expectancy sufficiently definite, specific, and capable of acceptance in the sense that there is a reasonable probability of it maturing into a future economic benefit to the plaintiff; (2) knowledge of the relationship, advantage, or expectancy by the defendant; (3) a purposeful intent to interfere with the relationship, advantage, or expectancy; (4) legal causation between the act of interference and the impairment of the relationship, advantage, or expectancy; and (5) actual damages.

*Robert's Haw. Sch. Bus.*, 982 P.2d 853, 887 (emphasis and notation omitted).

Except in one regard, the Court agrees with Defendants that, at this juncture, summary judgment is inappropriate on this claim.   Initially, as with other

64

counterclaims discussed above, Defendants focus this claim on Jass' alleged conduct *after* May 1, 2019.   Dkt. No. 106 at 21.   Therefore, to the extent the allegations concern conduct on or before May 1, 2019, this claim is dismissed.

With respect to conduct alleged to have occurred after May 1, 2019, Jass' arguments are unpersuasive.   First, Jass' argument with respect to the effect of the SAPA on this claim ignores Defendants' allegations that he misrepresented the relationship with KL *after* May 1, 2019.   In this light, representations or promises that were made in the SAPA could not possibly apply to conduct that allegedly occurred afterwards.   Second, merely because KL canceled *some* services before May 1, 2019 does not mean that there could be no reasonable expectation KL would continue as a client.   This is particularly so here where, after May 1, 2019, Jass told Gulban that "a lot of additional business was available" from KL. 8/16/21 Gulban Decl. at ¶ 9, Dkt. No. 92-4.

Third, similarly, merely because Jass argues that he was President of SMC does not mean, as he contends, that he "could not as a matter of law have interfered with CR's contract."   Dkt. No. 94 at 21.   As with Claim Six, without any explanation, Jass appears to believe that, simply because he was an officer of SMC, he could not have acted outside the scope of his employment.   There is no logical reason why this must be so.   Finally, in light of Jass allegedly telling

Gulban that there was a lot of additional business available from KL, the Court does not agree, at least at the summary judgment stage, that a reasonable jury could not infer a purposeful intent to interfere in the relationship between HopOne and KL.[36]

Accordingly, with respect to conduct after May 1, 2019, Jass is not entitled to summary judgment on this claim.

## IV.   **Counterclaims Against Wong**

1.    Claim One: Conversion

In their Counterclaims against Wong ("Wong Counterclaims"), Defendants first alleged that Wong had HopOne and SIT emails in his possession that he kept for his personal benefit.   Wong Counterclaims at ¶¶ 87-88, Case No. 20-cv-66-DKW-RT, Dkt. No. 18.   In his motion for summary judgment, Dkt. No. 95, Wong argues that this claim is barred by the SAPA.   *Id*. at 2-4.   In response, Defendants argue that Wong is not a party to the SAPA and, therefore, this claim cannot be barred on that basis.   Dkt. No. 106 at 11.

The Court agrees with Defendants.   Notably, Wong does not dispute that he is not a party to the SAPA, and he fails to explain, therefore, how the same could

---

[36]Jass also argues that a defendant must have actual knowledge of the business relationship, but then only discusses *Gulban's* alleged awareness of the KL business.   Dkt. No. 94 at 21-22. Therefore, the Court does not find this argument to be persuasive.

bar Defendants from bringing this claim against him.   *See* Dkt. No. 95 at 2-4; Dkt. No. 110 at 5-6.   Instead, Wong's motion for summary judgment in this regard appears to be merely a regurgitation of Jass' arguments.   *See* Dkt. No. 95 at 2-3 ("Any contractual duties *Jass* may have owed to CR prior to May 1, 2019, would be encompassed in the [SAPA] between CR and Jass….") (emphasis added).[37]

Accordingly, Wong is not entitled to summary judgment on this claim.

2.    Claim Two: Fraudulent Concealment

With respect to this claim, the parties' arguments mirror those made in connection with the same counterclaim asserted against Jass.   *Compare* Dkt. Nos. 95 at 4-7, 110 at 6-7, *with* Dkt. Nos. 94 at 4-7, 111 at 7-8; Dkt. No. 106 at 12-14. The Court, therefore, adopts the findings made in Section III(2) *supra*, with the result being Wong is not entitled to summary judgment on this claim.

3.    Claim Three: Defamation

In the Wong Counterclaims, Defendants alleged that Wong defamed Gulban and Visco.   Wong Counterclaims at ¶¶ 114-120.   More specifically, Defendants

---

[37]In his reply, Wong asserts that CR has conceded summary judgment is appropriate with respect to conduct prior to May 1, 2019.   Dkt. No. 110 at 6.   As to Wong, that is simply inaccurate. *See* Dkt. No. 106 at 10-12.   Wong also argues, like Jass before him, that CR has conceded he did not retain a benefit from the alleged conversion.   Dkt. No. 110 at 6.   Like Jass, though, Wong did not raise this argument in his motion for summary judgment with respect to the conversion claim.   *See* Dkt. No. 95 at 2-4.   Therefore, the Court does not consider it for that purpose.

alleged that Wong accused Visco of undermining his authority "discriminatorily[,]" Wong accused Gulban and Visco of taking "discriminatory, retaliatory, predatory, adverse actions against [SMC] employees[,]" and stated that Gulban and Visco had "obstruct[ed] justice…." *Id*. at ¶¶ 114-116.

Wong moves for summary judgment, arguing that there is no evidence his statements were anything other than opinions, he did not publish the statements to a third-party because CR was his "joint employer" and the statements were made to Fee, a CR employee, and his statements were privileged because he and Fee, CR's HR manager, had a joint interest in claims of discrimination.   Dkt. No. 95 at 8-11.   In response, Defendants argue that Wong's statements were facts, rather than opinions, and issues of fact exist over whether his statements were privileged. Dkt. No. 106 at 24-25.

In Hawaiʻi, a party asserting defamation must establish: (1) "a false and defamatory statement concerning another;" (2) "an unprivileged publication to a third party;" (3) "fault amounting at least to negligence on the part of the publisher…and;" (4) "either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Beamer v. Nishiki*, 670 P.2d 1264, 1271 (Haw. 1983).   A qualified privilege "arises when the author of the defamatory statement reasonably acts in discharge of some public or

private duty, legal, moral, or social, and where the publication concerns subject matter in which the author has an interest and the recipients of the publication a corresponding interest or duty." *Hamm v. Merrick*, 605 P.2d 499, 502 n.2 (Haw. 1980). A qualified privilege can be lost, however, if it is abused. *Kainz v. Lussier*, 667 P.2d 797, 802 (Haw. Ct. App. 1983). Abuse can occur by "(1) excessive publication, (2) use of an occasion for an improper purpose, or (3) lack of belief or grounds for belief in the truth of what is said." *Id*.

Here, except in one instance, the Court finds Wong's arguments unpersuasive. First, construed in the light most favorable to Gulban and Visco as the non-movants, the Court disagrees that no jury could find Wong's statements−specifically, the statements about Gulban and Visco acting "discriminatorily" or taking "discriminatory" actions−to be statements of fact, rather than opinions.

Second, although Wong argues that CR was his "joint employer" and, thus, his statements to Fee could not have been to a third-party, he provides no explanation and cites no authority for why the "joint employer" theory is applicable to a defamation claim. *See Rhodes v. Sutter Health*, 2012 WL 1868697, at *9 (E.D. Cal. May 22, 2012) (explaining, in dismissing a defamation claim, that "plaintiff provides absolutely no support whatsoever for the novel

argument that it would be appropriate for the court to apply the integrated enterprise theory, a theory developed in an employment-specific context, to common law tort claims."); *supra* § I.7.[38]

On the other side, Defendants fail to respond to Wong's argument that his alleged statement to Gulban and Visco, concerning them "obstructing justice[,]" was not made to a third-party.   The only evidence cited regarding this statement is an email from Wong to Gulban, Visco, and Ken Nunes.   *See* Dkt. No. 106 at 24 (citing 9/23/19 Email from Wong to Gulban, Visco & Ken Nunes, Dkt. No. 92-76 at 3).   While that email does involve Wong making the accusation that justice had been obstructed, it was made to the same people he was accusing of said obstruction−Gulban, Visco, and Nunes.   In this light, given that Defendants fail to explain how the statement was made to a third-party, *see* Dkt. No. 106 at 23-25, the Court cannot find that this is an actionable defamatory statement and grants Wong's motion for summary judgment solely in that respect.   *See Gonsalves v. Nissan Motor Corp. in Haw., Ltd.*, 58 P.3d 1196, 1218 (Haw. 2002) ("defamation

---

[38]In his reply, Wong asserts that, even if CR and SMC were not his joint employer, Defendants failed to address an argument that CR and SMC are "related companies…."   Dkt. No. 110 at 13. Wong, however, did not raise this argument in his motion for summary judgment.   *See* Dkt. No. 95 at 9.

must be communicated to some third party other than the person defamed.")

(quotation omitted).

Third, with respect to Wong's "qualified privilege" argument, Defendants do

not dispute, at least for purposes of summary judgment, that Wong's statements to

HR manager Fee were privileged.   *See* Dkt. No. 106 at 24-25 (arguing that the

privilege has been "abused," rather than that the statements were not privileged).

Whether a "qualified privilege was abused is one of fact for the trier of fact to

decide."   *Kainz*, 667 P.2d at 802.   At this juncture, therefore, the only question is

whether there are disputed facts on this issue for a jury to resolve.   Construed in

the light most favorable to Gulban and Visco, the Court finds that there are issues

of disputed fact.   For example, although Wong contends that he was asked or

subjected to discriminatory questions and comments, Gulban and Visco either

dispute that those questions or comments were made or contend that there were

innocent reasons for the same.   Should a jury believe Gulban and Visco's account

over that of Wong's, a jury could infer that Wong lacked "ground for belief in the

truth of what [he] said."   *See id*.

Accordingly, except with respect to the "obstructing justice" statement,

Wong is not entitled to summary judgment on this claim.

4.      Claim Four: Breach of Contract

With respect to this claim, the parties' arguments mirror those made in connection with the same counterclaim asserted against Jass.   *Compare* Dkt. Nos. 95 at 11-13, 110 at 8-10, *with* Dkt. Nos. 94 at 7-10, 111 at 8-10; Dkt. No. 106 at 14-17.   The Court, therefore, adopts the findings made in Section III(3) *supra,* with the result being that Wong is entitled to summary judgment on this claim because CR is neither a party to, nor a third-party beneficiary of, Wong's EA.

5.     Claim Five: Breach of Good Faith and Fair Dealing

With respect to this claim, the parties' arguments again mirror those made in connection with the same counterclaim asserted against Jass.   *Compare* Dkt. Nos. 95 at 14-15, 110 at 10-11, *with* Dkt. Nos. 94 at 10-11, 111 at 10-12; Dkt. No. 106 at 17-18.   The Court, therefore, adopts the findings made in Section III(4) *supra,* with the result being that Wong is entitled to summary judgment on this claim because CR, as neither a party to, nor a third-party beneficiary of, Wong's EA, cannot assert a claim thereunder, whether implied or direct.

6.     Claim Six: Unjust Enrichment

In the Wong Counterclaims, Defendants alleged that Wong misappropriated and misused HopOne and SIT emails, and he was "unjustly enriched as a result…." Wong Counterclaims at ¶ 144.   In his motion for summary judgment, Wong argues that this equitable claim fails because there is a valid contract between the

72

parties−the SAPA−and he did not retain any benefit from the emails because they were deleted upon his termination.   Dkt. No. 95 at 15-17.   In response, Defendants argue only that Wong was not a party to the SAPA.   Dkt. No. 106 at 10-12.

Here, as an initial matter, the Court agrees that Wong has made an absurd assertion−that "a valid express contract [the SAPA] exists between the parties that covers the subject matter at issue[]" (Dkt. No. 95 at 15)−when he is clearly *not* a party to the same.   *See* Dkt. No. 95-6 at 1, 4.[39][40]   Nonetheless, Defendants do not address Wong's argument that he did not retain a benefit from the emails after he deleted them.   *See* Dkt. No. 106 at 10-12.   Therefore, because this is an element Defendants must prove, *see Durette*, 100 P.3d at 74, Wong is entitled to summary judgment on this claim.

7.   Claim Seven: Civil Conspiracy

With respect to this claim, the parties' arguments mirror those made in connection with the same counterclaim asserted against Jass.   *Compare* Dkt. Nos. 95 at 17-18, 110 at 12-13, *with* Dkt. Nos. 94 at 13-15, 111 at 12-13; Dkt. No. 106

---

[39]In citing to Dkt. No. 95-6, the Court uses the page numbers assigned by CM/ECF in the top right-hand corner of the document, *i.e.*, "Page 1 of 11."

[40]Again, it appears that Wong has merely regurgitated the language used in *Jass*' motion for summary judgment.   *Compare* Dkt. No. 95 at 15, *with* Dkt. No. 94 at 11-12.

at 18-20.   The Court, therefore, adopts the findings made in Section III(6) *supra*, with the result being that Wong is not entitled to summary judgment on this claim.

## CONCLUSION

For the reasons set forth herein, the Court:

(1)    GRANTS in part and DENIES in part Defendants' motion for summary judgment, Dkt. No. 92;

(2)    DENIES Jass' motion for summary judgment on Counts I and VII of the Second Amended Complaint, Dkt. No. 93;

(3)    GRANTS in part and DENIES in part Jass' motion to dismiss or, in the alternative, for summary judgment on all counterclaims, Dkt. No. 94; and

(4)    GRANTS in part and DENIES in part Wong's motion to dismiss or, in the alternative, for summary judgment on all counterclaims, Dkt. No. 95.

In light of the above rulings, the following claims are dismissed:

- From Jass' Second Amended Complaint: Claims 1-7, and Claims 8-9 to the extent they are brought against Gulban and Visco;

- From Wong's Complaint: Claims 2-5;

- From the counterclaims against Jass: Claim 1 to the extent it is based on the conversion of property retained on or before May 1, 2019, Claims 3-4, Claim 5 to the extent it is based upon Jass' alleged enrichment from

work emails, and Claim 7 to the extent it concerns conduct on or before

May 1, 2019; and

- From the counterclaims against Wong: Claim 3 to the extent it concerns

  an "obstructing justice" statement, and Claims 4-6.

All other claims remain for trial, as set forth herein.[41]

IT IS SO ORDERED.

DATED: November 17, 2021 at Honolulu, Hawaiʻi.



Derrick K. Watson
United States District Judge

---

[41]The Court notes that, in addition to the arguments addressed above, the parties also dispute whether CR was the "alter ego" of SMC, with Jass arguing that he was entitled to summary judgment on said issue.  *See* Dkt. No. 93 at 2-7; Dkt. No. 106 at 5-8.   While it was unnecessary to resolve this issue in deciding the motions for summary judgment, the Court notes that summary judgment would not have been appropriate.   As mentioned in a prior Order, in Hawaiʻi, at least 25 factors have been identified as being potentially relevant in evaluating whether an entity may be held liable as the alter ego of another.   Dkt. No. 13 at 28 & n.12.   No one factor is dispositive and a totality of the circumstances approach is taken.  *Id*.   Here, there are far too many facts in dispute, or unaddressed, for an accurate totality of the circumstances evaluation to be divined on the present record.   For example, the evidence is either disputed or unclear on issues such as the alleged organizational chart for SMC, whether CR had the authority to "dictate" what SMC employees could do pursuant to the ISA (*see* Dkt. No. 109-1 at ¶ 11), and whether SMC "relied" on CR for funding (*see* Dkt. No. 93-1 at ¶ 11) or whether the ISA merely "obligated" CR to pay for certain expenses of SMC (*see* Dkt. No. 106-1 at ¶ 11).   Thus, while other facts−that are both for and against each party−are clearer, the disputed facts here do not allow for a determination to be made as a matter of law on this issue.